# IN THE COURT OF APPEALS OF IOWA

No. 13-0727
Filed November 13, 2014

IN RE THE MARRIAGE OF ANN DIMARTINO
AND JOSEPH DIMARTINO

Upon the Petition of
ANN DIMARTINO,
      Petitioner-Appellee,

And Concerning
JOSEPH DIMARTINO,
      Respondent-Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, John G. Linn, Judge.

A father challenges the district court's order imposing a discovery sanction in the dissolution proceeding and the decree granting physical care of his daughter to her mother. **AFFIRMED.**

Stephanie L. Kozlowski of Swanson, Gordon, Benne, Clark & Kozlowski, L.L.P., Burlington, for appellant.

Richard A. Bartolomei of Bartolomei & Lange, P.L.C., Des Moines, for appellee.

Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**TABOR, J.**

Ann DiMartino served as primary caregiver during her daughter's early childhood in North Carolina and Iowa and as the sole caregiver from 2010 to 2013—when the girl's father, Joseph DiMartino, left Iowa to return to his home state of North Carolina. At trial, both parents sought physical care of then ten-year-old N.D. The district court granted physical care to Ann and liberal visitation to Joseph. Joseph appeals, seeking physical care. As a threshold issue, Joseph contends the district court abused its discretion in limiting each side's presentation of evidence as a discovery sanction.

Recognizing the district court enjoys broad leeway in addressing discovery disputes, we decline to find an abuse in its remedy here. On the substantive issue, we agree with the district court's assessment that leaving day-to-day care with Ann and allowing extended visits with Joseph during the summer and school breaks is in N.D.'s best interest. Accordingly, we affirm the decree's physical care resolution.

**I. Background Facts and Proceedings**

Ann grew up in Burlington, Iowa, and Joseph grew up in North Carolina. They met when they were in their late teens and worked together selling magazines in Illinois. Joseph eventually convinced Ann to move to North Carolina to live with him; they began cohabitating in September 2001. When Ann became pregnant, they moved into an apartment above the garage of Joseph's parents in Greenville, North Carolina, and their daughter N.D. was born in July 2002. Joseph worked full time, pulling the night shift at a twenty-four-hour

restaurant. Ann stayed home with N.D. for four months and then worked part-time at a restaurant. In May 2003 Joseph started working for DirecTV. The district court found: "Although Joseph and his mother both provided caretaking to [N.D.] when Ann was at her part-time job, a reasonable conclusion can be made that Ann was [N.D.'s] primary caretaker during the first two years of her life."

In 2004 Ann and Joseph separated. Ann and N.D. moved to Indiana to live with Ann's mother while Joseph remained in North Carolina. Ann started working for Nationwide Auto Service. Eventually, Joseph and Ann agreed to Joseph periodically visiting N.D. in Indiana. In January 2005 Nationwide offered Ann a promotion if she would move to Florida. She and Joseph agreed N.D., age two and one-half years, would live with Joseph in Greenville for an indefinite period of time while Ann worked in Florida. Over the next four months, Ann drove from Florida to Greenville two or three times to visit N.D.

Ann's time in Florida was short. In April 2005, when Joseph visited Ann there, she decided to quit her job and returned to Greenville with him. They again lived in the apartment above the garage, and Ann worked in retail while Joseph continued installing satellite television systems. In 2007 Ann and Joseph bought a home in Greenville and lived there the next two years. On October 18, 2008, they married. But their marriage was in trouble by 2009. That June, Ann visited her father and other relatives in Burlington. While there and without telling Joseph, Ann reconnected with Brandon, an old boyfriend. When Ann returned to Greenville, she announced she wanted to move back to Burlington. Joseph agreed to move to Iowa but was unhappy about leaving a good job and having to

sell their house. At that point, N.D. had attended preschool, kindergarten, and first grade in Greenville.

In September 2009 Ann, Joseph, and seven-year-old N.D. moved to Burlington and lived with Ann's step-brother, Derek Taylor. N.D. started second grade and has attended the same Burlington grade school through fifth grade. Within days of the move, Joseph discovered Ann's relationship with Brandon. In the presence of N.D., Joseph confronted Ann, assaulted her, and left. But having no place to go, Joseph eventually returned and lived in the basement while Ann and N.D. lived upstairs. During this strained truce, Ann continued to see Brandon, and she remained romantically involved with him through the time of trial in February 2013.

In December 2009 Joseph rented a house in Burlington and moved N.D. out of Taylor's residence. While Joseph worked at DirecTV, Ann came to Joseph's rental house and took care of N.D. Ann then moved into Joseph's residence as a roommate; the tension between the parties continued. Ann cared for N.D. during Joseph's shifts, but his hours were more limited than in Greenville. Joseph attended to N.D. when he was home.

The couple's final separation occurred in April 2010, when Joseph moved back to North Carolina. Joseph agreed N.D., who was almost eight years old, would stay with Ann in Burlington. In Greenville, Joseph continued to work as a self-employed subcontractor installing satellite television systems. Joseph requested visitation for the summer of 2010. N.D. spent several weeks with Joseph in Greenville and also visited Ann's mother in Indiana.

After Joseph left Burlington, Ann was N.D.'s sole caretaker for the next three years. From 2010 through 2012, Joseph's name remained on the lease and he paid $650 in monthly rent directly to the Burlington landlord.

In August 2011 Joseph started living with his girlfriend Ashley in a two-bedroom apartment located near his parents' Greenville home. Joseph requested visitation for the summer of 2011, but Ann was unwilling to let her visit unless Joseph signed a letter promising he would return N.D. to Burlington for school. Joseph agreed and N.D. spent a month with Joseph that summer, while also visiting Ann's mother.

Also relevant to the court's physical care decision is the fact N.D. has a younger half-sibling, I.S.—who is the son of Ann and Brandon. I.S. was born in August 2011. During her summer pregnancy, Ann grew stressed about how she would take care of two children and suggested to Joseph that N.D. live with him temporarily. Ann changed her mind after she had a chance to discuss her stress with her doctor.

Ann's relationship with Brandon involved allegations of domestic violence. For instance, Brandon allegedly assaulted Ann in 2011. Ann recanted her claim, telling the court she had been untruthful because she was angry at Brandon. The court dismissed the charge.

In February 2012 Joseph filed for divorce in North Carolina. On April 10, 2012, Ann filed a dissolution petition in Iowa. The Iowa court ordered the parties to attend mediation. On April 19, 2012, the North Carolina court entered a

"Judgment of Absolute Divorce" that dissolved the marriage of Ann and Joseph, but did not resolve any property or custody issues.

Also in the spring of 2012, Joseph told Ann he was unwilling to continue paying rent on the house. Up to this point Joseph had not paid any child support. The parties worked with an Iowa mediator and on June 18, 2012, the mediator filed a memorandum of understanding of their agreement to a joint legal custody parenting plan.[1] In the plan Joseph would be removed from the current lease on the house, with the deposit and first month's rent going to Ann.

In early July 2012 the court filed a consent order on temporary matters, granting the parties joint legal custody of ten-year-old N.D., with physical care to Ann and liberal visitation to Joseph, including every spring break, alternating winter/Thanksgiving breaks, and summer visitation. Later in July, the court ordered Joseph to pay Ann temporary child support of $778.99 per month. N.D. spent about six weeks in Greenville during the summer of 2012. By the time of trial, Ann lived with her children in a different apartment.[2]

A few months before trial, in November 2012, Joseph reported Ann to the Iowa Department of Human Services (DHS) child abuse hotline, alleging Ann's former landlord found drug-making materials after she moved out. After receiving only vague information from the landlord, DHS employee Maria George interviewed ten-year-old N.D. George found N.D. to be "very talkative" and "very

---

[1] Under the plan, N.D. resided with Ann during the school year and with Joseph during the summer and during both the winter and spring school breaks.
[2] At trial, Joseph complained he was unaware of Ann and N.D.'s location after they moved out of the house. Joseph had supplied N.D. with a cell phone, and Ann told N.D. to tell Joseph about their move but did not independently contact him.

pleasant," as well as "forthcoming with information." N.D. gave George "no indication" drugs were "used in the home." But during their conversation, N.D. did tell George she was asked to watch her younger brother while her mom drove Brandon to work. N.D. recalled "this was mostly last year because they got a new truck and her mom does not know how to run it." N.D. said she and Brandon got along fine "and she does not see him much but on weekends."

George followed up with Ann and Brandon. Brandon admitted prior drug use but denied currently using drugs and advised he was providing urinalysis for his probation officer. Ann denied using drugs. Both were candid about having N.D. stay with a sleeping I.S for ten minutes on a few occasions while Ann drove Brandon to work. Ann explained she did not want to wake I.S. for the drive and N.D. was no longer watching I.S. alone. George advised Ann not to leave N.D. home alone with I.S. Brandon acknowledged a history of domestic violence, but said the incidents did not occur in the presence of the children.

Next, George contacted Brandon's probation officer, who believed Brandon was doing well and was not currently using drugs. George also learned Brandon had a significant criminal history. The DHS report[3] concluded the child abuse allegations were "not confirmed for manufacture and possession of a dangerous substance," but were "founded for denial of critical care, failure to provide proper supervision." George wrote: "The mother admitted to leaving the

---

[3] The report's "narrative and comments" section provides: Ann and Brandon "appear to be bonded with both children. [They] appear to have reasonable expectations of the children. The family has support from extended family and friends."

two children home alone for a period of time of at least ten minutes. This happened on a few occasions. I.S. was a newborn and N.D. was age nine."

A two-day trial commenced on February 14, 2013. Ann and Joseph agreed on joint legal custody and both requested physical care of N.D.[4] For reasons we will discuss in the following division of this opinion, the only witnesses were Ann, Joseph, and the DHS worker, George. The record showed both parties were in their early thirties, enjoyed good health, and have extended families involved in N.D's life.

Ann testified she was working part-time at McDonald's. She leaves early for work three or four mornings during the week, arriving home at 3:00 p.m., when she takes over child care. Brandon has his own residence but spends from four to seven nights a week at Ann's residence. When Ann leaves early for work, Brandon takes care of N.D. and I.S. Brandon works from 4:00 p.m. to 12:30 a.m. Ann described the activities she and N.D. do together.

Joseph testified to a demanding work schedule. He works six days a week and every second or third Sunday. Joseph suggested his girlfriend Ashley or mother could care for N.D. when he was working.[5] Joseph admitted calling the DHS with concerns about Ann. In his testimony, Joseph highlighted Ann's many residential moves to support his belief that he and Ashley would offer N.D.

---

[4] The parties stipulated to Brandon's paternity of I.S., and the court ordered Joseph's paternity of the child I.S. "is disestablished."

[5] The court ruled:

> When asked about childcare when N.D. is not in school, Joseph did not present a well thought out plan, but merely predicted that somebody in his family would always be available to help. It does not appear that Joseph has really considered how he would become N.D.'s primary caretaker if he were granted her physical care.

a more stable environment. Joseph also expressed concerns about Brandon's presence in N.D.'s life. In addition to his own testimony, Joseph called George to testify in his case. The DHS worker told the court she was not concerned Ann would repeat the behavior that resulted in the founded child abuse report and had no other worries about Ann's parenting.[6]

The court's April 2013 ruling granted "full faith and credit to the North Carolina judgment entry dissolving the marriage of the parties." The court granted physical care of N.D. to Ann with liberal visitation to Joseph—every spring break, alternating Thanksgiving and winter breaks, and summer visitation starting seven days after school ends through seven days before school starts, with fourteen consecutive days for Ann between July 10 and July 31. Joseph now appeals.

## II. Standards of Review

We review de novo claims arising from a decree dissolving a marriage. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). "We give weight to the findings of the district court, especially to the extent credibility determinations are involved." *Id*; *see In re Marriage of Fennelly*, 737 N.W.2d 97, 101 (Iowa 2007) (recognizing the district court's opportunity to observe the witnesses).

On the issue of discovery, the district court is vested with wide discretion. *In re Marriage of Bolick*, 539 N.W.2d 357, 361 (Iowa 1995). We will only reverse if the district court has abused that discretion. *Id*.

---

[6] While George was aware Joseph made a second report to DHS, she was not investigating that pending complaint. The district court found: "In an effort to bolster his custody case, Joseph made two separate complaints to DHS."

**III. Discovery Disagreement**

Before we reach our rationale for affirming the physical care order, we address the parties' discovery dispute. We start with a chronology of the critical discovery dates. On October 1, 2012, the court issued an order summarizing a pretrial conference; that order set November 15, 2012 as the deadline for exchanging discovery. Trial was set for December 12, 2012.

Presented with a joint motion to continue, on December 3, 2012, the court reset the trial for February 14, 2013. The parties were to exchange witness lists, exhibit lists, and exhibits by February 1, 2013. On December 19, 2012, Joseph filed a motion to compel, asserting Ann had failed to provide "any answers to interrogatories, a formal response to the request for production, nor any documents whatsoever" by the court-ordered deadline of November 15. The motion also pointed out Ann did not object to Joseph's discovery requests. The court granted Joseph's motion to compel on January 7, 2013. That order noted the parties agreed to the discovery deadline of November 15 and that deadline was not altered by the jointly requested continuance. In late January the court denied Ann's motion to reconsider and ordered Ann to pay $416.70 of Joseph's attorney fees.

Later, the parties filed cross motions regarding what they perceived as the shortcomings in the other side's discovery responses. On January 31, 2013, Ann filed a motion to strike, complaining Joseph had not made himself and his girlfriend available for depositions and had not timely supplemented his interrogatory responses. Ann asked that Joseph's witnesses "be stricken and

excluded from trial." On February 1, 2013, Joseph filed a request for sanctions. After a hearing, the court's February 7, 2013 order imposed the following discovery sanction:

> [N]either Petitioner nor Respondent will be permitted to call any witnesses, offer any exhibit, or document, unless the witness, exhibit, or document was previously identified and disclosed, to other counsel, on or before November 15, 2012. All discovery disclosed after November 15, 2012, shall be excluded during trial of this case.

As an exception, the court allowed the testimony of DHS worker George and the admission "of any and all DHS investigator reports."

At the start of the February 14 trial, Joseph offered the excluded exhibits en masse and without specific identification, requesting their admission by stipulation. Ann declined to stipulate. The court ruled: "Your exhibits will be shown as offered, and they are excluded based on the court's earlier sanction."

On appeal, Joseph claims the district court abused its discretion by not allowing him to call other witnesses or offer additional exhibits. He argues the court did not follow the procedures under Iowa Rule of Civil Procedure 1.517 for imposing sanctions and even if the rule did apply, the sanction was too harsh.

Ann urges Joseph did not make an offer of proof regarding what his evidence would have shown as required by Iowa Rule of Evidence 5.103(2), and accordingly, has not preserved error. *See In re Marriage of Wersinger*, 577 N.W.2d 866, 868 (Iowa Ct. App. 1998) (finding district court should not have precluded husband from introducing evidence, but without an offer of proof, there was nothing for appellate court to review). In the alternative, Ann argues the district court did not abuse its discretion in limiting the evidence as to both parties

as a sanction for discovery abuses. She asserts Joseph did not supplement his answers to interrogatories or timely provide a witness list to her—in violation of the continuing duty to do so imposed by Iowa Rule of Civil Procedure 1.503(4).

We opt to decide the issue on Ann's alternative ground and find no abuse of discretion in the district court's discovery sanction imposed against both parties. Iowa appellate courts are "slow to find an abuse of discretion" when a district court imposes a sanction for dilatory responses to discovery orders. *See Sullivan v. Chicago & Nw. Transp. Co.*, 326 N.W.2d 320, 324 (Iowa 1982). In this physical-care litigation, both parties recognized November 15, 2012, as the deadline for exchanging discovery. They also knew the trial continuance did not change that deadline. In granting Joseph's motion to compel, the court made clear to the parties that they were to have completed discovery by November 15 and violation of that deadline carried consequences. In denying Ann's motion to extend the discovery deadline for the purpose of deposing Joseph and his girlfriend, the court noted discovery "closed on November 15, 2012" and the case had been on file for more than eight months. In her motion to strike, Ann detailed her efforts to resolve the discovery issues without intervention of the court, as required by rule 1.517.

Contrary to the claims of the parties, the district court complied with rule 1.517, and its sanction order was an even-handed and fair response to what it characterized as "pretrial bickering" between the parties. Contrary to Joseph's argument, the sanction was not overly harsh. The court allowed both parents to make their records through their own testimony and included an exception for the

DHS worker who investigated Joseph's complaint against Ann. We cannot say the district court abused its discretion in dealing with the contentious discovery postures taken by both parties in this case. *See Sullivan*, 326 N.W.2d at 325 (finding no abuse in district court's exclusion of witnesses who were identified three weeks before trial).

**IV. Physical Care**

Joseph seeks physical care of N.D., who is fortunate to have two loving, capable parents who wish to provide her with a home. N.D. is also fortunate to be closely bonded to both parents—Ann has provided sole caretaking for the past three years, and Joseph has actively exercised his visitation and initiates regular telephone contact. N.D. is also bonded with both parents' extended families.

Physical care is "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." Iowa Code § 598.1(7) (2013). In resolving this physical care issue, our primary consideration is the best interests of N.D. *See Fennelly*, 737 N.W.2d at 101. Physical care determinations strive to place children in the environment most likely to promote their long-term physical and emotional health. *Hansen*, 733 N.W.2d at 695. We also aim to assure the "maximum continuing physical and emotional contact with both parents" insofar as is reasonable and in the child's best interest. Iowa Code § 598.41(1)(a).

The fact Ann was N.D.'s primary caretaker before the April 2010 separation and the girl's sole caretaker for the past three years does not

guarantee Ann will be awarded physical care. *In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991) (affirming physical care with father despite mother's role as primary caretaker). But a history of being the primary caregiver is a weighty factor in our determination. *See In re Marriage of Decker*, 666 N.W.2d 175, 178 (Iowa Ct. App. 2003). After performing our de novo review, we agree with the district court's finding: "The fact N.D. is presently happy, healthy, thriving, and a good student is due to Ann's efforts."

Also, Iowa courts prefer not to separate siblings, including half-siblings. *In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). The presumption that siblings should reside together may only be overcome if their separation "may better promote the long-range interests of children." *Id.* The record shows N.D. and her younger brother I.S. have a close bond. On our de novo review, we agree with the district court's finding: "It would be unfortunate and sad to separate N.D. from I.S., which would occur if Joseph is granted N.D.'s physical care." Thus, the presumption has not been overcome in this case.

In a through and well-reasoned decree, the district court saw Joseph's decision to return to North Carolina in April 2010 as a turning point for the family.[7] Joseph left N.D. in Ann's sole care in Burlington where "she has now put down roots." The court appropriately gave "paramount importance" to "ensuring some level of stability" for N.D. *See In re Marriage of Coulter*, 502 N.W.2d 168, 171

---

[7] The court ruled:
> Joseph attempts to justify his action in leaving N.D. and Ann by claiming during trial testimony it was his intent that [she] move to North Carolina in the summer of 2010. No facts brought out at trial support this claim, and at best, this is merely a rationalization offered by Joseph to justify his decision to leave his daughter.

(Iowa Ct. App. 1993) (stating the importance of stability "cannot be overemphasized"). The court recognized Ann had moved multiple times in the last three years, but found stability in the fact Ann and N.D. "have remained in Burlington. N.D. has attended the same school. The status quo has been N.D. residing with Ann in Burlington and then visiting Joseph for weeks or months during the summer."

The court also addressed Joseph's anxiety about N.D.'s exposure to Ann's boyfriend. The court did not think Ann "exercised good judgment in developing a romantic relationship with Brandon," but found "it appears at the present, [he] is rehabilitated"—he "is compliant with all terms of probation and has passed all drug tests."

Considering the record anew, we find Ann is the parent who can more effectively meet N.D.'s present and future needs, just as she has done in the past. The goal of ensuring N.D.'s stability and maintain the sibling connection is also served by granting physical care to Ann. The plan used by the parties after their separation and during the pendency of the case, which was essentially adopted by the district court, works in N.D.'s best interests. Thus, we affirm.

**AFFIRMED.**