# IN THE COURT OF APPEALS OF IOWA

No. 15-1570
Filed September 14, 2016

IN RE THE MARRIAGE OF DANIEL JAMES COMSTOCK
AND JESSICA COMSTOCK

Upon the Petition of
**DANIEL JAMES COMSTOCK,**
    Petitioner-Appellant,

**And Concerning**
**JESSICA COMSTOCK,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Page County, Richard H. Davidson, Judge.

Daniel Comstock appeals the physical-care and child-support provisions of the decree dissolving his marriage to Jessica Comstock. **AFFIRMED AS MODIFIED AND REMANDED.**

Jon H. Johnson and Whitney A. Free of Johnson Law, P.L.C., Sidney, for appellant.

Jamie L. Hunter of Dickey & Campbell Law Firm, P.L.C., Des Moines, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Daniel Comstock appeals the physical-care and child-support provisions of the decree dissolving his marriage to Jessica Comstock. Daniel argues the district court erred in awarding physical care of the parties' three minor children to Jessica. He also asserts, should the physical-care decision be affirmed, the district court erred in calculating his child-support obligation by basing it on his earning capacity rather than his actual earnings. On our de novo review, we affirm as modified and remand.

## I.     Background Facts and Proceedings

Daniel and Jessica married in 2007. They have three children: T.C., born in 2007; H.C., born in 2008; and J.C., born in 2011. The parties separated in August 2014, when Daniel left the marital home and moved into his parents' home with the parties' three minor children. On August 28, Daniel filed a petition for dissolution of marriage. On October 20, the district court entered a temporary order awarding the parties joint legal and physical custody of their children, alternating parenting time with the children on a weekly basis.

In January 2015, Daniel discovered Jessica had plans to move to Tennessee with her boyfriend, Ken, and the parties' children and sought modification of the temporary custody order. The court granted Daniel's request and awarded him physical care of the children. The order provided Jessica was to have "reasonable visitation with the children upon written notice to Daniel on condition the children remain in the state of Iowa." Jessica and Ken moved to Tennessee in February. Jessica gained employment in Tennessee in March,

following which the court ordered her to pay $360 per month in temporary child support to Daniel beginning in May. The matter came on for trial on July 1.

At the time of trial, Daniel lived with his parents and the parties' three minor children in Shenandoah with plans to move back into the marital home. In 2014, Daniel attended college full-time online studying criminal justice. He considered himself to be a stay-at-home dad for four of the parties' eight-year marriage. From 2008 until 2011, Daniel did not work outside of the home. In 2011, Daniel started working for a private company and remained employed there until 2013. Thereafter, Daniel worked intermittently for a temporary agency and admitted he had quit two job assignments after only a matter of days because he did not like the work. At the time of trial, Daniel had been employed at one job assignment through the temporary agency for at least six months. By the time of the September hearing, however, Daniel had been laid off.

Shortly after the parties separated, Jessica moved out of the marital home and into the home of Ken's father. In November 2014, Jessica moved back into the marital home with Ken. In February 2015, she and Ken moved to Tennessee, where they continued to reside together at the time of trial. Jessica worked various jobs throughout the marriage and sometimes more than one job at a time, in addition to starting full-time nursing school in 2014. In the past, Jessica worked for a nonprofit agency that provided services to individuals with disabilities and a residential treatment facility for at-risk youths with behavioral issues. At the time of trial in July, Jessica was working for a call center in Tennessee. By the hearing in September, Jessica stated she was not working

for the call center anymore but anticipated being rehired there after the dissolution proceedings were finalized.

Jessica testified Daniel's choice to stay home with the children was a unilateral decision he made because he did not want to work. Jessica stated after the birth of H.C. in 2008, she returned to work only three weeks after a caesarean section delivery because Daniel refused to get a job. However, she also acknowledged she worked varying shifts and more than one job at a time and she depended on Daniel a lot to help with the children. Jessica testified she took care of everything involving the children and their schooling and that the task of getting the children up, ready, and to school often fell on her after she returned home from an overnight shift at work. She testified when she worked the day shift she would often get home around 11:30 p.m. or midnight to a messy home and would still have to give the children baths and get them ready for bed. She testified Daniel did not know the parties' middle child's diagnosis and she scheduled and took H.C. to all of her appointments.

Before the trial court, Jessica asserted Daniel refused to allow her visitation with the children between the time he moved out of the marital home with the children at the end of August and the time of the temporary hearing in mid-October 2014. Daniel denied the assertion and testified he allowed Jessica to visit with the children at his parents' home whenever she wanted but she did not take advantage of his offer. Daniel also contended that on November 12, 2014, the district court modified the temporary custody order to address visitation for the holidays. The court ordered Jessica would have visitation with the children on Thanksgiving, but Jessica failed to exercise her visitation with the

children because she went to Tennessee for a church event. Daniel further testified he offered Jessica additional visitation in summer 2015 but Jessica failed to take advantage of the opportunity.

Jessica testified she moved to Tennessee because she believed there would be better job opportunities for herself and Ken, a better education system for the children, and a specialized program for the parties' middle child, H.C. Jessica also testified they moved to Tennessee to be closer to Ken's family—Ken testified his mother and sister lived in Tennessee, his father lived in Iowa, and his children from a previous marriage lived in Kansas. Additionally, Jessica admitted they had rarely seen his mother or sister since moving there six months before.

Following her move to Tennessee, Jessica saw the children only three times between February and August 2015 due to financial reasons. In June, Jessica exercised visitation with the children for two and a half weeks. She offered to pay her younger sister to watch the children during the visit. At trial, the children's fifteen-year-old aunt testified Jessica and Ken worked all the time and then would come home and fight in their bedroom. She testified the children had good attitudes when they arrived in Tennessee and the youngest child was potty trained; however, the children's attitudes changed while they were there— one child told the others she hated them and tried hitting the aunt or running away—and the parties' youngest child regressed in potty training. The aunt testified Jessica and Ken yelled, screamed, and cursed at the children, Jessica spanked or slapped the children and Ken grabbed the children by the face or yanked them by the arm, and neither tried other methods of discipline. She testified Jessica and Ken did not make meals for the children and instead

brought fast food home at night after work for a late dinner. She testified Jessica rarely gave the children baths and the task often fell on the aunt instead. She testified that at times the only food in Jessica and Ken's home was the snacks Daniel sent with them for the trip. She stated she called her mother—the children's maternal grandmother—complaining she was scared and there was no food in the house, and the grandmother sent the aunt a care package of food and other supplies for the aunt and children. The aunt also testified she had observed Daniel cooking and cleaning for the children and disciplining the children using the time-out method when spending time with the children in Iowa.

The principal of the school where the two oldest children had attended in Iowa contributed a written statement, in which she wrote she had "observed and witnessed a significant change since the change of residence and care" during the 2014–2015 school year when the children began living with Daniel and their maternal grandparents. She noted the children had better hygiene, were well-rested, had an improved ready-to-learn demeanor, and also had better attendance. The principal further stated:

> After spending time with Mom, Jessica, the girls have come to school with dirty faces, dirty clothes, and mismatched shoes. Their hair has not been taken care of and is not clean, with days of having food in their hair. [The children] are often tired after spending the night with Mom. [H.C.] has fallen asleep several times during the school days and [T.C.] is often easily agitated.
>
> [The children] have shown consistency in the "ready to learn" characteristics after spending time with their paternal grandparents and Daniel. [H.C.'s] behavior has improved. Daniel has worked as an education partner with the school by attending her [Individualized Education Program (IEP) meetings] to provide more services to [H.C.]. [T.C.] is more flexible and interacts with her peers without agitation. The girls are well-rested, clean, and anxious to be at school.

I have included a copy of their attendance for you to view regarding my attendance concerns when these young ladies stay with Mom. Every minute of their education matters.

This positive change for these young ladies in this short of time has made a successful impact on their education in various aspects.

The principal also testified at trial in July, stating both parents were present at the children's activities, although she acknowledged Jessica did not attend any school activities for the children after she moved to Tennessee. The principal recognized Jessica had attended more IEP meetings for the children than Daniel, but acknowledged Daniel attended at least three or four meetings and noted Jessica had left one meeting early. The record demonstrates Jessica took the lead role in IEP meetings and initiated passing a notebook back and forth with H.C.'s teacher so that the parties could communicate with the child's teacher regarding her progress.[1] The principal also testified about attendance issues involving the children in the past and stated the school did not have any truancy concerns when the children were in Daniel's care. Regarding the children's truancy, Jessica stated the parties' middle child was often absent due to doctors' appointments, while the parties' oldest child was often absent because Daniel refused to get her ready for school and drop her off. Jessica testified regarding an incident in which she was at the library prepping for her own class and received a call from the school that the children were not there. She stated when she asked Daniel about it, he told her someone from the school had come to the home, but he did not answer the door.

---

[1] However, the record also shows Jessica's relationship with the school was not without its struggles. The principal testified regarding an incident in which Jessica became angry with the school secretary, and thereafter, Jessica was not allowed to be alone with the secretary when she came to the school.

Daniel testified at trial that throughout the length of the marriage, Jessica did fifty percent of the housework but believed he did much more than fifty percent toward the end of the marriage. He also alleged Jessica trashed the marital home after he left with the children in August 2014, testifying there was trash, dog feces, and animal urine all over the floor and mold was growing on the walls. He also testified there were no beds for the children in the home. Jessica claimed the home was in poor condition when Daniel and the children moved out, and she and Ken spent several weeks cleaning and fixing up the home before they could move into it in November. However, she also admitted the family did not have a dog and the dog came into the home after the parties separated. Daniel further testified he discovered the home was trashed again after Jessica and Ken moved to Tennessee and he had to clean and make repairs to the home before it was habitable. Daniel also testified he got the mortgage caught up and paid overdue utility bills on the home without Jessica's help. Jessica admitted she sold several household items from the home and did not use the proceeds for marital debts. Jessica further admitted she continued to collect supplemental security income payments as payee for the parties' middle child even after Daniel was awarded temporary physical custody of the children and was in arrears on her child-support obligation.

On July 4, 2015, one of the parties' children told Daniel and two other members of Daniel's family that Ken had sexually abused her. Daniel contacted the Iowa Department of Human Services (DHS) and the family doctor, who advised Daniel to take the child to the emergency room. Daniel also contacted authorities in Tennessee, who investigated the claims and determined the

allegations to be unfounded. Due to the children's allegations, Daniel filed an emergency motion for modification of visitation, requesting a delay in Jessica's visitation with the children scheduled to begin on July 19. The district court granted Daniel's motion. On August 2, Daniel and Jessica exchanged the children for a two-week visit. On August 11, Jessica filed a motion for emergency modification of visitation, asking the district court to grant Jessica sole legal and physical care of the children alleging Daniel and his family members had coached the children to falsely accuse Ken of sexual abuse. The court ordered the children to remain with Jessica in Tennessee until the scheduled hearing on September 2 and terminated the order prohibiting contact between Ken and the parties' children. Jessica enrolled the two older children in school in Tennessee, but because Tennessee did not have preschool for three-year-olds, the youngest child was not eligible to attend preschool.[2]

The court reopened the record and held another day of testimony on September 2. Jessica testified Daniel did not inform her of the allegations made against Ken; instead, she learned about the allegations from her lawyer on July 17, two days before the children were scheduled to begin an extended visit with her. Jessica admitted she argued with Ken "a little bit" while the children were visiting them in June when the children's aunt was babysitting, but denied arguing with Ken within the preceding two months. The parties' oldest child testified she liked living with both Jessica and Daniel and that she missed her dad. The child further stated, "My mom told me lies," and upon further

---

[2] The record indicates both of the parties' older children attended preschool at age three in Iowa. Additionally, Daniel testified J.C. was registered and had completed all of the necessary screenings to attend preschool in Iowa.

questioning explained Jessica had told the child to lie to the interviewer in Tennessee and say she wanted to live with Jessica.

On September 4, 2015, the district court entered a decree awarding physical care to Jessica and reasonable and liberal visitation to Daniel. The court ordered Daniel to pay $75 per month in child support to Jessica for October, November, and December 2015, and ordered the amount of child support to increase to $500 per month beginning in January 2016. Daniel appeals.

## II.      Scope and Standard of Review

We review dissolution cases, which are tried in equity, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483–84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend upon the facts of the particular case." *In re Marriage of Fennelly,* 737 N.W.2d 97 (Iowa 2007) (citation omitted).

## III.      Analysis

Daniel claims the district court erred in awarding physical care of the parties' three minor children to Jessica. He also contends the court erred in calculating his child support obligation based on his earning capacity rather than his actual earnings.

### A.      Physical Care

When child custody and physical care are at issue in a marriage dissolution case, the primary consideration is the best interests of the children.

Iowa R. App. P. 6.904(3)(o).  We look to the factors listed in Iowa Code section

598.41(3) (2013)[3] and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa

1974),[4] in making a physical-care determination.  Also relevant to this decision

---

[3] Iowa Code section 598.41(3) provides "the court shall consider the following factors" in making a physical care determination:
    a.  Whether each parent would be a suitable custodian for the child.
    b.  Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
    c.  Whether the parents can communicate with each other regarding the child's needs.
    d.  Whether both parents have actively cared for the child before and since the separation.
    e.  Whether each parent can support the other parent's relationship with the child.
    f.  Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
    g.  Whether one or both the parents agree or are opposed to joint custody.
    h.  The geographic proximity of the parents.
    i.  Whether the safety of the child, other children, or other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
    j.  Whether a history of domestic violence, as defined in section 236.2, exists. . . .
    k.  Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is required to register or is on the sex offender registry as a sex offender under chapter 692A.

[4] Additional factors the court should consider include:
    (1) The characteristics of each child, including age, maturity, mental and physical health.
    (2) The emotional, social, moral, material, and educational needs of the child.
    (3) The characteristics of each parent, including age, character, stability, mental and physical health.
    (4) The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
    (5) The interpersonal relationship between the child and each parent.
    (6) The interpersonal relationship between the child and its siblings.
    (7) The effect on the child of continuing or disrupting an existing custodial status.
    (8) The nature of each proposed environment, including its stability or wholesomeness.

are the factors of continuity, stability, communication, and approximation. *See In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Not all factors are given equal consideration, and the weight attributed to each factor depends on the specific facts and circumstances of each case. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). Our objective is to place the children in an environment likely to promote a healthy physical, mental, and social maturity. *Hansen*, 733 N.W.2d at 695.

Jessica and Daniel both agreed the other is fit and proper to parent their children and the children's best interests are served by each parent being involved in the children's lives. It is obvious both parents love their children and are capable of providing a stable home for them.

In its decree, the district court acknowledged there were "numerous problems" during the parties' marriage and both Jessica and Daniel "were responsible for the family's dysfunction." The court noted Jessica worked long hours while attending school and "did not believe Daniel was doing his part." Daniel testified he was a stay-at-home parent to save the family money on daycare expenses. He further testified that although Jessica often got the parties' two oldest children ready in the mornings and took them to school, he picked the children up from school, prepared their meals, and got them ready for bed. Jessica testified Daniel stayed at home not because he wanted to save the

---

(9) The preference of the child, if the child is of sufficient age and maturity.

(10) The report and recommendation of the attorney for the child or other independent investigator.

(11) Available alternatives.

(12) Any other relevant matter the evidence in a particular case may disclose.

family money but instead because he did not want to work. However, Jessica admitted she relied heavily on Daniel to care for the children because she worked long hours and attended school full time.

The district court did not make specific credibility findings in its written ruling but obviously seemed skeptical about whether Daniel was "truly a stay-at-home dad," noting "for whatever reasons, it seems th[e] role of [getting the children to school] often times fell on Jessica." The court noted the children had school attendance issues and "were often not adequately dressed and had a difficult time staying awake" at school. The court found both parents were responsible for meeting the needs of the children prior to their separation and that some of these issues had existed then.

The school principal testified that during the 2014–2015 school year, she had observed the children exhibit significant progress after being placed in Daniel's physical care. The principal stated after the children spent time with Jessica, they had poor hygiene, mismatched shoes, and would be tired and have behavioral problems. In contrast, the principal recognized after the children spent time with Daniel, the children came to school with better hygiene, appeared well-rested, were prepared with a ready-to-learn attitude, and had better attendance. The court acknowledged the progress but concluded it was "unknown . . . how much of the improvement was due to [Daniel] stepping up as opposed to his mother . . . taking the leading role caring for her grandchildren."

We recognize Jessica took the lead role in the children's IEP meetings and took H.C. to most, if not all, of her doctors' appointments prior to the parties' separation, but Daniel has not been uninvolved in the children's care. He

attended several IEP meetings for the two older children over the years, and regardless of why he did not work, the record clearly demonstrates Daniel provided care for the children while Jessica was at work and school. *See Hansen,* 733 N.W.2d at 697 (noting "the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution"). The fact remains the children showed marked improvements in their cleanliness, attitudes, and attendance at school after being placed in Daniel's temporary care. *See id.* ("[S]uccessful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality.").

The district court gave Daniel some credit when it recognized "he has been employed the last six months leading up to the July 1 hearing date," but then became critical, writing

> Yet, he seems to lack a strong work ethic that is required in all families, but certainly as a single parent. While Daniel's family members have seen improvement in his role as father, it is difficult to discern how much his mother provides in caring for the children. On the other hand, Jessica is by all accounts a hard worker and has always seemed to have numerous oars in the water. She has been actively involved in [H.C.]'s IEP and has a history of working with persons with special needs.

The district court seemed unconcerned that Jessica had moved to Tennessee with her new boyfriend while the dissolution proceedings were ongoing and left the children behind with Daniel. She testified she moved to Tennessee for better job opportunities and because she believed Tennessee could provide the children with a better education. Neither Jessica nor Ken had a job offer when they moved to Tennessee. Jessica also asserted the move to Tennessee allowed them to be closer to Ken's family. Ken testified his mother and sister live

in Tennessee, but his father lives in Iowa and his two children from a prior marriage live in Kansas. Jessica also admitted they had rarely seen Ken's family since moving to Tennessee in February. On the other hand, Daniel had a steady job for six months leading up to the trial until he was laid off. Prior to the decree, he brought the mortgage up to date and paid overdue utility bills. Daniel had plans to live in the marital home where the children grew up and continue to live near his and Jessica's extended families.[5]

The district court also emphasized the investigation into the allegations of abuse against Ken and noted Jessica's contention that Daniel and his mother "conspired to manipulate the children in making the abuse allegations," and determined, "If true, such an act of manipulation would all but preclude consideration of Daniel as a primary caregiver." The court noted the evidence indicated Daniel's mother "suggested the improper touching to the young Comstock children," which both Daniel and his mother denied. The court further noted "the Comstock grandparents have done much to support their grandchildren" and "seem[] to have accepted the results of the investigation." Ultimately, the court found Daniel's failure to "immediately notif[y] Jessica upon learning of the allegations made by their children . . . was not only a poor choice but is a significant factor for the Court to consider when determining which parent is most likely to support the other parent's relationship with their children."

We agree with Jessica and the district court that sexual-abuse allegations are very serious, and Daniel should have informed her. Jessica admitted that if

---

[5] We also note, placing the children in Daniel's physical care would allow H.C. to continue to be treated by the doctors who diagnosed her and have worked with her since the age of three.

Daniel had informed her of the allegations, she would have relayed them to Ken—possibly hindering the ongoing investigation into the matter. Daniel contacted DHS in both Iowa and Tennessee and took the child to the emergency room. Based on these facts, we do not agree with the district court that Daniel's failure to inform Jessica of the allegations is evidence he will not support her relationship with the children in the future. On the contrary, we find Jessica's move to Tennessee, for seemingly no reason other than to begin a new life with her new boyfriend, suggests she does not prioritize supporting Daniel's relationship with the children.[6]

The district court also seemingly found Jessica more credible when she testified Daniel refused to allow her access to the children during the two-month period between their separation and entry of the temporary custody order, and Daniel less credible when he testified he offered visitation to Jessica whenever she wanted during that period but told her the visits had to occur at his parents' home where he and the children were residing because he feared Jessica would leave the state with the children. The district court found: "Daniel's failure to keep Jessica informed of significant matters concerning her children combined with his failure to allow her visitation with the children from the time he moved in August 2014 until the temporary hearing demonstrates that supporting Jessica's relationship with the children is not a priority."

---

[6] We also note the irony in Jessica's unproven complaint that Daniel and his family coached the children to make false allegations against Ken, when there is clear evidence in the record Jessica told the parties' oldest child to lie and say she wanted to live with Jessica.

To the extent to which that brief time period is of concern, those concerns are neutralized by the record evidence that once the district court entered the temporary order, Daniel fully complied with the order and did not interfere with Jessica's parenting time. The record also demonstrates the court modified the temporary order in November 2014 to provide Jessica with visitation with the children on Thanksgiving, but instead of exercising her visitation, Jessica traveled to Tennessee for a church event. In January 2015, the court granted Daniel's request for a modification of the temporary order and ordered Daniel to have physical care of the children pending a final hearing in the matter and provided Jessica was to have visitation with the children so long as the children remained in Iowa. Daniel testified he offered Jessica visitation with the children, but Jessica claimed that due to financial reasons she could only exercise visitation with the children three times between February and August 2015. Those financial reasons were presumably the result of her decision to move out of state with her boyfriend without either of them having secured employment. The record also shows Daniel invited Jessica's family to a birthday party he was hosting for the children. Thus, her complaints directed at Daniel of denying her access ring hollow against her own history of not exercising visitation when she had every right to do so.

The court discussed factors supporting Daniel's request for physical care of the children, including "the number of extended family members that reside in the Page County area from both Daniel's family and Jessica's family, the children's familiarity with the school system, and the fact that [H.C.] has treated with Iowa doctors concerning her development issues," but did not give them

much weight. The court ultimately determined "Jessica is best suited to have primary care of the parties' three children" for three main reasons: (1) "[s]he has been employed throughout the marriage and shown she can provide a home for the children," (2) "[s]he has been actively involved in [H.C.]'s care since age three and has experience with working with others with development issues," and (3) "the Court [took] Jessica at her word when she testified she could actively support Daniel's relationship with the children."

We agree with the district court these are all factors we must consider in making a physical-care determination, but unlike the district court, we cannot give only a passing glance to other factors that weigh in Daniel's favor. Daniel was the primary caregiver for the children for most of the marriage. The two older children showed significant improvement in their behaviors and hygiene at school when in Daniel's physical care. The record also indicates the parties relied on their families extensively during the marriage and early years of the children's lives. Daniel's parents regularly cared for the children when both parties had to work and would spend time with the children for days and weeks at a time. Jessica's mother and sisters also cared for the children on numerous occasions. It is obvious the children enjoy close ties to both extended families, all of whom live in the Shenandoah area near Daniel and where the children have spent almost their entire lives.

We commend Jessica for her devoted work ethic; however, we again note that she moved to Tennessee without arranged employment, and when employed, her schedule undoubtedly requires someone else to care for the children when they are not in school. Jessica moved to Tennessee during the

middle of the dissolution proceedings, leaving the children behind in Daniel's care. When she had the children for visitation in the summer, she was unable to adequately provide food and proper care for the children. Jessica does not have any of her extended family nearby to help care for the children. Ken testified his sister could care for the children if asked, but the children do not know Ken's sister and she is essentially a stranger to them. The availability of grandparents to assist a parent in caring for children is a factor a court may consider in determining which parent should receive physical care. *Melchiori v. Kooi*, 644 N.W.2d 365, 369 (Iowa Ct. App. 2002) (noting grandparents may be better childcare providers than strangers); *see also In re Marriage of Welbes*, 327 N.W.2d 756, 758 (Iowa 1982) (affirming grant of physical care of child to father, who had "assumed the responsibility of caring for her with the assistance of his parents"); *In re Petition of Purscell*, 544 N.W.2d 466, 469 (Iowa Ct. App. 1995) (placing physical care of child with father who lived with his parents and who would receive assistance from them in caring for the child). Placing the children in Daniel's physical care in Iowa, near the children's extended families on both sides, ensures the children would have childcare providers whom they know and trust and who have helped care for them their entire lives.

Upon our de novo review of the record, we find both parties are clearly capable parents who can provide the children with a stable home. We recognize uprooting the children from the home and school they have known for the past year and asking them to move several states away from their new friends and their mother will be difficult. However, for the reasons discussed above, we conclude placing the children in the physical care of Daniel is in their long-term

best interests. We affirm as modified the portion of the district court's decree granting Jessica physical care of the parties' three minor children.

Accordingly, we need not decide and do not reach the child-support issues Daniel raises. We remand this case to the district court for determination of Jessica's child-support obligation based upon the present financial circumstances of the parties.

### B. Appellate Attorney Fees

Jessica requests appellate attorney fees.[7] Appellate attorney fees are not a matter of right, but rather rest in this court's sole discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In determining whether to award attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* After considering the relative financial positions of the parties and Daniel's successful appeal of the physical-care award, we decline to award Jessica appellate attorney fees.

### IV. Conclusion

We modify the district court's decree to grant Daniel's request for an award of physical care of the parties' three minor children. We remand the issue of child support and other related matters to the district court for further proceedings consistent with this opinion. We deny Jessica's request for an award of appellate attorney fees. Costs on appeal are assessed to Jessica.

**AFFIRMED AS MODIFIED AND REMANDED.**

---

[7] In his reply brief, Daniel asserts he should be awarded appellate attorney fees. We do not address issues raised for the first time in a party's reply brief. *See Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009).