# IN THE COURT OF APPEALS OF IOWA

No. 16-1767
Filed August 2, 2017

IN RE THE MARRIAGE OF ABBY HOEGER NABER
AND WILLIAM MICHAEL NABER

Upon the Petition of
**ABBY HOEGER NABER,**
        Petitioner-Appellant,

**And Concerning**
**WILLIAM MICHAEL NABER,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Dubuque County, Michael J.

Shubatt, Judge.


        Abby Hoeger Naber appeals from the physical-care and property-

distribution provisions of the decree dissolving her marriage to William Michael

Naber.  **AFFIRMED AS MODIFIED.**


        Mark D. Fisher of Nidey Erdahl Tindal & Fisher, P.L.C., Cedar Rapids, for

appellant.

        Robert L. Sudmeier of Fuerste, Carew, Juergens & Sudmeier, P.C.,

Dubuque, for appellee.


        Considered by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, Presiding Judge.**

Abby Hoeger Naber appeals from the physical-care and property-distribution provisions of the decree dissolving her marriage to William Naber. We affirm as modified.

## I. Background Facts and Proceedings

Abby, born in 1981, and William, born in 1974, met in 2000 and married in October 2004. The parties, both residents of Dyersville, Iowa, have three minor children: J.R.N., born in 2008; J.O.N., born in 2011; and J.W.N., born in 2012. Abby has an associate's degree in nursing and is employed as a nurse at a hospital. William, who has a vocational technical certificate, was employed by Mi-T-M for most of the duration of the parties' marriage. Throughout the marriage, Abby worked a 6 p.m. to 6 a.m. shift three days a week to maximize the time she could spend providing care for the parties' children. Because of this, Abby provided for the majority of the children's day-to-day needs. William also contributed to the maintenance of the family by, in addition to working an 8 a.m. to 5 p.m. job, performing the majority of the household cleaning and yard work. The record reflects that, despite the parties' differences, both parents were devoted to their children and greatly involved in their lives.

In July 2015, the parties separated, and Abby filed a petition for dissolution of marriage. In August 2015, Abby filed a petition for relief from domestic abuse, and the court entered a temporary protective order that same day. On August 17, 2015, a temporary order was entered upon agreement of the parties by which Abby was awarded use of the marital home; Abby was also awarded physical care of the children, and William was awarded visitation. As a

result of that agreement, the August 2015 petition for relief from domestic abuse and temporary order were dismissed. Leading up to the trial, William exercised his visitation in the marital home—by agreement of the parties to provide normalcy for the children—until this practice was discontinued when Abby took issues with some of William's conduct in the home.

Trial on this matter was held in August 2016. Most of the parties' disputes revolved around each parent's respective involvement with the children, communication issues, and drinking habits. Abby and her family testified at length at how particular William was; how he was controlling toward Abby by constantly making demands of Abby and limiting her contact with her family; that he experienced great personal struggle as a result of the separation and divorce—some of which was exhibited in front of the children; and that he regularly consumed alcohol—including when supervising the children. William testified to specific incidents when Abby engaged in excessive drinking and extra-marital relations and that Abby had a history of dishonesty. The record clearly establishes William initially did not want this divorce, tried to reconcile with Abby, and experienced great personal difficulty throughout the divorce process. However, the record also establishes each party's acceptances that their marriage is now irreconcilably broken and commitment to focusing on their children. In October 2016, the district court entered its decree, awarding joint legal custody, establishing a shared-care arrangement, declining to award child support to either party, distributing the marital assets, and declining to award either party attorney fees. Abby appeals, seeking physical care of the children

and a modification of the equalization payment awarded to William. William resists, and both parties seek an award of appellate attorney fees.

## II. Scope and Standard of Review

We review dissolution cases, which are tried in equity, de novo. Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483–84 (Iowa 2012). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend on the facts of the particular case." *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

## III. Analysis

### A. Physical Care

When child custody and physical care are at issue in marriage dissolution cases, the primary consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(o); *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). The court must consider joint physical care if requested by any party, and if it denies joint physical care, the court must make specific findings of fact and conclusions of law that an award of joint physical care is not in the children's best interests. Iowa Code § 598.41(5)(a) (2015); *In re Marriage of Hansen*, 733 N.W.2d 683, 692 (Iowa 2007). Our law provides a nonexclusive list of factors the court shall consider in determining a custodial arrangement, *see* Iowa Code § 598.41(3), as well as nonstatutory factors, *see Will*, 489 N.W.2d at 398 (citing *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974)). Factors to be considered in determining whether joint physical care is in the children's best

interests include (1) continuity, stability, and approximation; (2) "the ability of spouses to communicate and show mutual respect"; (3) "the degree of conflict between parents"; and (4) "the degree to which the parents are in general agreement about their approach to daily matters." *Hansen*, 733 N.W.2d at 696–99. Not all factors are given equal consideration, and the weight of each factor depends on the specific facts and circumstances of each case. *In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998).

As we consider the factors of continuity, stability, and approximation, we note Abby has been the primary caregiver to these children for their entire lives. *See Hansen*, 733 N.W.2d at 700 (noting, "[f]or most of the marriage, [the mother] has been the primary caregiver" and thus "[t]he concepts of continuity, stability, and approximation . . . cut strongly against joint physical care as a quality alternative least disruptive to the children and most likely to promote their long-term physical and emotional health"). This was, in large part, by virtue of Abby's work schedule. Throughout the marriage, Abby worked from 6 p.m. to 6 a.m. three nights a week to increase her availability to provide childcare the rest of the week.[1] William admitted Abby has had the majority of involvement in the children's medical and dental care, taking the children for haircuts, arranging childcare, getting the children ready for school, shopping for the children, transporting them to extracurricular activities, taking them to church, caring for the children when they are sick, registering them for school, and making the children's meals. In other ways, the parties' involvement with the children has been in equal proportion, such as in participating in the children's extracurricular

---

[1] William worked a shift from 8 a.m. to 4:50 or 5:00 p.m.

activities and providing after-school care. We note William took on other responsibilities for the family, including taking on the lion's share of the household cleaning and yard work. And the parties disagreed on who spent more time playing with the children, bathing the children, doing the laundry, and helping put the children to bed, each favoring themselves. Regardless, the record supports that, prior to the parties' separation, Abby was the primary caregiver to the children. *See id.* at 697 (noting the relevant consideration that "the caregiving of parents in the post-divorce world should be in rough proportion to that which predated the dissolution"). Further, since the temporary order was entered in August 2015, through the date of trial in August 2016, Abby has had physical care of the children, with William exercising visitation every other weekend and on Tuesday afternoon to Wednesday afternoon of every week. However, as noted by the district court, William has provided significant care for the children, when recognizing his work schedule kept him out of the home during the traditional workweek timeframe. There is no indication William did not desire to be a fully invested parent.

Next, we consider the parties' abilities to communicate and show mutual respect. *See* Iowa Code § 598.41(3)(c); *Hansen*, 733 N.W.2d at 698. The record reflects the parties have had periods in which they were able to successfully communicate. For a significant period of time after their separation, Abby allowed William to have visitation at the marital home and William continued to do the yard work for the marital property.

However, the parties have also had periods of difficulty communicating. Abby testified the parties have had issues communicating and agreeing about

things regarding the children—such as their fighting over whether one of the children should participate in a basketball camp, where to exchange the kids, and William's willingness to let one son skip out on his Boy Scouts gatherings. She also stated the children would come back to her calling her "bad" and "fat" and accusing her of breaking up the family, which she believes William talks about to the children. The arrangement by which William was able to exercise visitation with the children in the marital home was terminated—according to Abby—because William kept leaving papers around the house about affairs, divorce, and anger management.

Abby also recounted how William had called her names both in front of and away from the children. William admitted to using foul language toward Abby in front of the children but stated that both parties had participated in this behavior and the incidents had been infrequent. William otherwise denied saying anything negative about Abby to the children.

Abby also recounted two incidents in which she claimed William failed to communicate about or treat the children's medical conditions. On one occasion, she had dropped off the children with William while one child was sick; when she returned, the child's condition had substantially worsened, requiring medical intervention. The second time, a child was hit on the head with a metal sign, and William did not obtain medical treatment for the child. When Abby arrived, she took the child to the emergency room where the child received three stitches. She also testified William fails to attend to the eldest child's school papers, including not signing permission papers or assisting in the completion of projects.

However, like the district court, we recognize the vast majority of the parties' poor communication is a result of the stress of the separation and pending divorce. The examples provided by Abby predominately arise from the time period during the separation—when the conflict between the parties was at its greatest. There was no finding of any domestic abuse between the parties. Both parties have admitted the other is a good parent, has a good relationship with the children, and the children love the other parent.

As to the third factor, our supreme court has noted:

> Joint physical care requires substantial and regular interaction between divorced parents on a myriad of issues. Where the parties' marriage is stormy and has a history of charge and countercharge, the likelihood that joint physical care will provide a workable arrangement diminishes. It is, of course, possible that spouses may be able to put aside their past, strong differences in the interest of the children. Reality suggests, however, that this may not be the case.

*Hansen*, 733 N.W.2d at 698. Generally, we note the degree of conflict between the parties has been largely a result of the breakdown of their marriage and William's attempts at reconciling with Abby. We agree with the district court the conflict between the parties is likely to lessen with the finality of a formal custody arrangement.

As to the fourth *Hansen* factor, which considers "the degree to which the parents are in general agreement about their approach to daily matters," *id.* at 699, we agree with the district court that this factor weighs in favor of awarding a shared-care arrangement. Nothing in the record indicates the parties have differing views in rearing the children.

In reviewing a request for shared care, we must consider the "total setting presented" in this case and determine what is in the best interests of the children. *Id.*; *see also* Iowa Code § 598.41(5)(a). In so doing, we acknowledge both parents greatly love their children.

We agree with the assessment of the district court:

Both parties drink and were eager to testify regarding things that happened when the other party was intoxicated. It is not necessary for the court to recount the various incidents that were described, but suffice it to say that the evidence did not paint a particularly flattering picture of either party.

We acknowledge both parties also raise the mental health of the other parent. The record indicates Abby suffered from postpartum depression and William is diagnosed with obsessive compulsive disorder. William admits to being very cleanly and orderly as a result of his condition. However, there is no indication the mental-health struggles of either parent has had a meaningful impact on the children.

Although we find this case to be a close call, we cannot disagree with the findings of the district court which led it to this conclusion:

Abby is not perfect, and nor is [William]. Both have done things that do not reflect particularly well on them, and many of those things involve alcohol consumption. That hardly makes them unique. At the end of the day, both are good parents and can adequately care for the children. Despite the fault they find with each other, each party acknowledges that the other party is a good parent to the children. The *Hansen* factors all support a shared-care arrangement. Accordingly, the court concludes that such an arrangement is in the best interest of the boys.

Accordingly, we affirm the custody ruling made by the district court.

### B. Property Allocation

Abby challenges the district court's award of a $25,000 equalization payment. In matters of property distribution, we are guided by Iowa Code section 598.21. The parties in a dissolution action "are entitled to a just and equitable share of the property accumulated through their joint efforts." *In re Marriage of O'Rourke*, 547 N.W.2d 864, 865 (Iowa Ct. App. 1996). Iowa law does not require an equal division, but rather, "what is fair and equitable in each circumstance." *In re Marriage of Campbell*, 623 N.W.2d 585, 586 (Iowa Ct. App. 2001). "Equitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results." *In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). Thus, "it is inherent in the court's equitable powers, to make appropriate adjustments, according to the unique facts of each case." *Id.*

In its decree, the district court awarded Abby property having a net value of $110,638.96 and William of $86,197.78, a difference of $24,441.18. Finding that difference to be roughly $25,000, the district court ordered Abby to pay William $25,000, apparently believing that was necessary to equalize the awards.

Abby first complains the district court erred in failing to consider a personal $3500 loan she obtained during the separation. We find no inequity in the court's determination this loan is the sole and separate responsibility of Abby. However, we agree with Abby's complaint the district court mistakenly ordered Abby to pay William $25,000, the result of which would leave Abby with $85,638.96, and William with $111,197.78, effectively reversing the inequities.

The court also awarded William the marital home, in the event he is able to obtain refinancing. The court found the equity in the home was $50,779.30. Absent the equalization payment, this would increase the total net award to William to $136,977.08, if he can refinance. If he cannot refinance the home, then the court ordered the home be sold and the net proceeds divided equally. In the event William is unable to secure refinancing and the property is sold and the proceeds of the sale of the marital home are split evenly between the parties, Abby would still receive an award of $24,441.18 in excess of that received by William, absent the equalization payment. To do equity between the parties, William would be entitled to an equalization payment of half that amount, or $12,220.59. This would result in William receiving $86,197.78 (property award), plus $12,220.59 (equalization payment), and plus $25,389.65 (assuming each party nets half the assumed equity in the home), for a total of $123,808.02. This would result in Abby receiving $110,638.96 (property award), minus $12,220.59 (equalization payment), and plus $25,389.65 (the other half of the equity in the home), for a total of $123,808.02.

In the event William is able to secure refinancing, he would receive a total award of $136,977.08 (the $86,197.78 property award plus the full $50,779.30 of equity in the marital home). This award to William exceeds the award of $110,638.96 given to Abby by $26,338.12 and entitles Abby to an equalization payment of $13,169.06 (i.e., one half of $26,338.12) from William.

Accordingly, we modify the district court's property distribution to award William an equalization payment of $12,220.59 to be paid by Abby in the event the marital home is sold and the proceeds are equally divided between the

parties. In the event William is able to secure refinancing for the home, we award Abby an equalization payment of $13,169.06 from William. Abby has requested that any equalization payment be made by a qualified domestic relations order (QDRO) from retirement funds. William's brief does not address this QDRO issue. On our review of the assets and income of each party, it is clear that a judgment under either scenario would be an undue burden on the parties. We determine the equalization payment ultimately required be satisfied through a QDRO prepared by the payor and submitted to the payee for approval within ninety days of completion of refinancing or closing on the sale of the home.

### C.     Appellate Attorney Fees

Both parties request appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). "[I]n determining whether to award attorney fees," we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted). Having considered these factors, we decline to award either party attorney fees on appeal. Costs shall be assessed equally between the parties.

**AFFIRMED AS MODIFIED.**