# IN THE SUPREME COURT OF IOWA

No. 23 / 05-1765

Filed July 20, 2007

IN RE THE MARRIAGE OF MICHELE RENEE FENNELLY
AND TED ERNST BRECKENFELDER

Upon the Petition of
MICHELE RENEE FENNELLY,

 Appellee,

And Concerning
TED ERNST BRECKENFELDER,

 Appellant.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Michael R. Mullins, Judge.

Former husband seeks further review of dissolution decree. **DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**

Frank Steinbach III of McEnroe, Gotsdiner, Brewer, Burdette & Steinbach, P.C., West Des Moines, and Arthur Buzzell, Davenport, for appellant.

Lori L. Klockau and Chad A. Kepros of Bray & Klockau, P.L.C., Iowa City, for appellee.

**STREIT, Justice.**

What is equitable in a divorce is an endless source of debate. Michele Fennelly and Ted Breckenfelder divorced after nearly fifteen years of marriage. They have two children. The district court gave Michele primary physical care of the children and Ted liberal visitation. The district court equally divided all of their property except property the parties brought to the marriage.

Ted argues he should have been awarded primary physical care or at least joint physical care of the children. Ted also complains of the district court's disparate treatment of their premarital property. Michele kept her premarital property which had significantly appreciated whereas Ted merely got the premarital value of his property. Because Michele is a competent and loving caretaker and both parties testified against joint physical care, we affirm the district court's award of primary physical care to Michele. We reverse the district court's property division because we find it equitable to equally divide the appreciation of all of the parties' premarital assets. However, because Ted dissipated marital assets through unexplained cash advances on his credit cards, we set aside $22,000 of debt for him. After setting aside the value of their premarital property at the time of the marriage and the $22,000 in cash advances, we order the parties' remaining assets and debts to be divided equally. We vacate the decision of the court of appeals. We remand to the district court so it may modify the decree in accordance with this decision.

I.      **Facts and Prior Proceedings**

Michele and Ted were married in December 1990. At the time of the marriage, Michele had obtained a bachelor's degree in management information systems and Ted had obtained a bachelor's degree in finance

and a law degree. Michele was a systems engineer at IBM and Ted practiced law at a Moline law firm.

Both parties owned assets at the time of the marriage. Ted owned an encumbered home located on Fairview Drive in Bettendorf, Iowa. Michelle owned IBM stock and an IBM tax deferred savings plan (TDSP).

Early on, the parties lived in the home on Fairview Drive. In 1993, they moved to a home on Barcelona Terrace in Bettendorf. The parties kept the Fairview Drive home as rental property. About this time, Ted started his own law firm. In 1994, Michele began working at Lee Enterprises where she currently is the director of technical support.

Michele and Ted have two children: Kevin, born November 25, 1991 and Caroline, born August 9, 1996. The parties utilized day care and baby sitters throughout the children's lives.

Michele filed for dissolution of marriage in 2001. The parties reconciled and Michele dismissed her petition. Thereafter, Ted began spending more time at home and became more involved in the children's care. In particular, Ted assumed a greater role in supervising the children after school and preparing meals. Ted also began devoting less time to his law practice.

Michele filed a second petition for dissolution in September 2004. Trial was held in June 2005. Michele was forty-two years old and Ted was forty-four.

At the time of trial, Michele's annual salary was $101,000 with the potential of earning another $30,000 in bonuses. In 2004, Ted earned $18,454 in net income from his law practice. Ted's average net income between 2001 and 2004 was just under $25,000 per year.

The district court awarded physical care of the children to Michele. Ted was awarded liberal visitation. The court also divided the parties'

assets and debts. The court set aside for Michele the IBM stock she owned prior to the marriage and the portion of the IBM TDSP traceable to the premarital value of the account along with appreciation. These assets were worth $116,094 on the date of trial. Ted was given a $12,000 credit for the premarital net equity in the Fairview Drive home.[1] Thereafter, the court equally divided the parties' remaining debts and assets. In all, the net distribution was $446,326 for Michele and $354,244 for Ted.

Ted appealed. He argued the district court erred (1) by not awarding him physical care of the children; (2) by not considering joint physical care in the alternative; and (3) by not treating the parties' premarital assets similarly.

The court of appeals affirmed the district court's order in its entirety. On further review, Ted reasserts the arguments he made before the court of appeals. For the reasons that follow, we affirm the district court's award of primary care to Michele and reverse the district court's division of property.

## II.    Scope of Review

We review dissolution cases de novo. *In re Marriage of Sullins,* 715 N.W.2d 242, 247 (Iowa 2006). " 'Although we decide the issues raised on appeal anew, we give weight to the trial court's factual findings, especially with respect to the credibility of the witnesses.' " *Id.* (quoting *In re Marriage of Witten,* 672 N.W.2d 768, 773 (Iowa 2003)). "Precedent is of little value as our determination must depend on the facts of the

---

[1]Although the district court made a specific finding that Ted should receive a $12,000 credit for his premarital equity in the Fairview Drive home, the court did not implement this finding in the final distribution of property. Thus, in response to a motion to enlarge or amend, the court gave Ted an additional $12,000 from Michele's Lee Enterprises retirement fund.

particular case." *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995) (citing *In re Marriage of Sparks*, 323 N.W.2d 264, 265 (Iowa Ct. App. 1982)).

### III. Merits

### A. Physical Care of the Children

Iowa law distinguishes custody from physical care. Custody concerns the legal rights and responsibilities toward the child, including decisions "affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5) (2005). Physical care, on the other hand, is "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." *Id.* § 598.1(7). When considering the issue of physical care, the child's best interest is the overriding consideration. We are guided by the factors set forth in Iowa Code section 598.41(3) as well as those identified in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). If joint physical care is not appropriate, "the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights." *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007).

Ted argues the district court should have awarded him physical care so the children may continue to live in the Barcelona Terrace home, which was awarded to him. Additionally, Ted argues he is better suited to be the primary physical caretaker because he spends less time working in comparison to Michele.

The district court found both parents to be suitable caretakers for the children. We agree. The record is replete with evidence of both parties' love and devotion to their children. At the end of the trial, the court noted the conundrum it faced in deciding who should be awarded

physical care because both parties are great parents. The district court had the opportunity to observe the witnesses and concluded primary care should be awarded to Michele. The district court awarded Ted the following visitation schedule: every third weekend (Friday 5 p.m. through Sunday 5 p.m.) and weekly "mid-week" visitation (Sunday 5 p.m. through Tuesday morning while school is in session and 5 p.m. when it is not). We see no reason to disturb the district court's decision. Ted conceded Michele is a competent caretaker and acknowledged plans to "ramp up" his law practice.

Alternatively, Ted claims the district court erred by not awarding the parties joint physical care of the children. Under Iowa Code section 598.41(5)(*a*),

> the court may award joint physical care . . . upon the request of either parent. If the court denies the request for joint physical care, the determination shall be accompanied by specific findings of fact and conclusions of law that the awarding of joint physical care is not in the best interest of the child.

Contrary to Ted's assertion on appeal, this passage does not create a presumption in favor of joint physical care. *In re Marriage of Hansen*, 733 N.W.2d 683, 692 (Iowa 2007). Rather, our statutory scheme simply makes joint physical care a viable option if it is in the child's best interest. We recently said "[t]he critical question in deciding whether joint physical care is . . . appropriate is whether the parties can communicate effectively on the myriad of issues that arise daily in the routine care of a child." *Hynick*, 727 N.W.2d at 580.

The parties dispute whether Ted requested joint physical care in the original proceedings. Ted's answer to Michele's petition sought "the parties' joint shared physical custody of their children." In his opening statement at trial, Ted's attorney stated the court needed to decide

"whether shared physical custody is appropriate in this case." Since the parties previously agreed to joint legal custody, we find it obvious Ted was requesting "joint physical care" even though he did not use those exact words. Moreover, the term "physical" connotes something more than the right to make legal decisions. We have never held a party must use *magic* words to convey a desire for "joint physical care." Nor are we interested in creating a trap for the unwary with respect to something so paramount.

Because the court did not award joint physical care, it normally would be required to specifically explain why joint physical care is not in the children's best interest. Iowa Code § 598.41(5)(*a*). However, no specific finding was required in the present case because Ted abandoned his request for joint physical care during the trial. In his testimony, Ted asked for primary physical care of the children. He stated joint physical care was not appropriate due to Michele's "tremendous amount of unresolved anger towards [him]." Similarly, Michele testified joint physical care was not appropriate because communication with Ted was "nearly impossible."[2] She also stated she believed joint physical care would be too disruptive and worried Ted would not provide a structured environment for the children. In sum, both parties conceded joint physical care was not preferable. Given the parties' apparent difficulty in communicating, joint physical care would not have been suitable. *See Hynick*, 727 N.W.2d at 580 (finding joint physical care inappropriate due to the parties' lack of mutual respect and inability to communicate).

---

[2]As evidence of their communication difficulties, Michele testified most of their discussions were in writing.

### B.    Premarital Property

Under our statutory distribution scheme, the first task in dividing property is to determine the property subject to division. *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). The second task is to divide this property in an equitable manner according to the enumerated factors in section 598.21 of the Iowa Code. *Id.* "Although an equal division is not required, it is generally recognized that equality is often most equitable." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005) (citing *In re Marriage of Conley*, 284 N.W.2d 220, 223 (Iowa 1979)).

Section 598.21(1) requires "all property, except inherited property or gifts received by one party," to be equitably divided between the parties. We have previously held "[t]his broad declaration means the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party." *Schriner*, 695 N.W.2d at 496 (citing *In re Marriage of Brainard*, 523 N.W.2d 611, 616 (Iowa Ct. App. 1994)). The district court "may not separate [a premarital] asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage." *Sullins*, 715 N.W.2d at 247. Instead, "property brought to the marriage by each party" is merely one factor among many to be considered under section 598.21. Other factors include the length of the marriage, contributions of each party to the marriage, the age and health of the parties, each party's earning capacity, and any other factor the court may determine to be relevant to any given case. Iowa Code § 598.21(1).

In the present case, the parties agreed to equally divide all property acquired during the marriage. However, the parties disagreed on how to divide their premarital property. Prior to the marriage, Ted owned the

Fairview Drive home and Michele owned 118 shares of IBM stock and an IBM tax deferred savings plan (TDSP). All of these assets increased in value during the marriage:

| ASSET | PREMARITAL VALUE | VALUE AT TRIAL |
|---|---|---|
| Fairview Drive home (Ted) | $12,000 (equity) | $29,900 (equity) |
| IBM stock (Michele) | $13,334 | $37,894 |
| IBM TDSP (Michele) | $12,311 | $78,200[3] |

Ted approved of the court setting aside the value of the parties' premarital contributions. However, Ted advocated the equal division of any appreciation that occurred during the marriage. Michele, on the other hand, asked the court to set aside her premarital assets as well as any appreciation in value during the marriage.

The district court found it "equitable that Ted receive credit for the premarital value of the equity in [the Fairview Drive home],[4] and Michele receive the premarital value of the IBM stock and IBM retirement plan and each party should receive the benefit or burden of any change in the respective values over which they had no particular control and to which neither made any particular contributions." Michele was awarded both her premarital assets and their appreciation (worth $116,094 on the date of trial) while Ted only received $12,000 for the premarital value of the Fairview Drive home. The court found it was justified in dividing the appreciation of the Fairview Drive home because the parties serviced the mortgage and maintained the home during the marriage while Michele's

---

[3]The total value of Michele's IBM TDSP at trial was $153,084. Michele acknowledged $74,884 was either contributed during the marriage or was appreciation of contributions made during the marriage. Thus, she asked for $78,200 to be set aside for her and agreed to split $74,884 with Ted.

[4]At the parties' request, Michele was awarded the Fairview Drive home and Ted was awarded the Barcelona Terrace home.

premarital assets increased "as a result of factors entirely beyond the control of the parties."

The court of appeals upheld the district court's disparate treatment of the parties' premarital assets. It stated:

> In this marriage of moderate length, it is Michele who has made the greatest tangible contributions, undertaking primary responsibility for the home, the children, and the parties' finances. In addition, it appears that, overall, she has made greater financial contributions to the marriage. Moreover, the record is clear that Michele's IBM stock and IBM TDSP, which have been kept separate from the family finances, appreciated purely due to fortuitous circumstances. In contrast, during the marriage the Fairview Drive home was used as rental property. Unlike a purely financial asset, an encumbered home must be maintained and its mortgage must be serviced. . . . In light of the foregoing circumstances, we find the property division to be equitable.

We do not find the parties' respective contributions to the marriage justify treating the parties differently. Michele's biggest criticism of Ted is his "failure without good cause to contribute financially to the marriage consistent with his earning capacity." However, we have never held or even insinuated that spouses should maximize their earning potential or risk being punished in the distribution of the parties' property. Iowa is a no-fault state. *In re Marriage of Williams*, 199 N.W.2d 339, 345 (Iowa 1972).

It is important to remember marriage does not come with a ledger. *See In re Marriage of Miller*, 552 N.W.2d 460, 464 (Iowa Ct. App. 1996). Spouses agree to accept one another "for better or worse." Each person's total contributions to the marriage cannot be reduced to a dollar amount. Many contributions are incapable of calculation, such as love, support, and companionship. "Financial matters . . . must not be emphasized

over the other contributions made to a marriage in determining an equitable distribution." *Id.* at 465.

In the present case, both parties contributed in countless ways to the marriage. Both worked outside the home, cooked, cleaned and looked after the children. We presume they found solace in one another, at least in the earlier years of their marriage. Although each party's contribution to a marriage is an appropriate factor affecting property division, it is not "useful to analyze the exact duties performed by the marriage partners." *In re Marriage of Grady-Woods*, 577 N.W.2d 851, 853 (Iowa Ct. App. 1998). Suffice it to say, neither party shirked his or her duties so as to justify disparate treatment.

Nor do we find it appropriate when dividing property to emphasize *how* each asset appreciated—fortuitously versus laboriously—when the parties have been married for nearly fifteen years. Property may be "marital" or "premarital," but it is all subject to division except for gifts and inherited property. Iowa Code § 598.21(1).

Considering all of the facts and circumstances of this case, we find it equitable to equally divide the appreciation of the parties' premarital assets. We need not decide whether it was appropriate to award the parties the value of their premarital contributions because both parties requested at least the value of their respective premarital property to be set aside. *See In re Marriage of Wendell*, 581 N.W.2d 197, 199 (Iowa Ct. App. 1998) (noting some circumstances may justify a full credit for premarital property but such a credit is not required). Thus, $12,000 should be set aside for Ted and $25,645 should be set aside for Michele. These figures represent the value of their premarital property on the date of their marriage.

**C.    Dissipation of Assets**

Michele urges us to take into account Ted's "unreasonable accumulation of debt." The district court found Ted's spending "behavior does not rise to the level of ill will or inappropriate conduct sufficient to justify variance" from an equal property division.

We have previously held dissipation of assets is a proper consideration when dividing property. *In re Marriage of Olson*, 705 N.W.2d 312, 317 (Iowa 2005) (citing *In re Marriage of Goodwin*, 606 N.W.2d 315, 321 (Iowa 2000)). In determining whether dissipation has occurred, courts must decide "(1) whether the alleged purpose of the expenditure is supported by the evidence, and if so, (2) whether that purpose amounts to dissipation under the circumstances." Lee R. Russ, *Spouse's Dissipation of Marital Assets Prior to Divorce as Factor in Divorce Court's Determination of Property Division*, 41 A.L.R.4th 416, 421 (1985). The first issue is an evidentiary matter and may be resolved on the basis of whether the spending spouse can show how the funds were spent or the property disposed of by testifying or producing receipts or similar evidence. *See id.* The second issue requires the consideration of many factors, including

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure benefited the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and the amount of, the expenditure.

*Id.*; s*ee In re Marriage of Burgess*, 568 N.W.2d 827, 829 (Iowa Ct. App. 1997) (stating when one spouse has dissipated marital assets, the critical question is "whether the payment of the obligation was a reasonable and expected aspect of the particular marriage"). Courts may also consider

"[w]hether the dissipating party intended to hide, deplete, or divert the marital asset." *Kondamuri v. Kondamuri*, 852 N.E.2d 939, 952 (Ind. Ct. App. 2006); *see In re Marriage of Cerven*, 335 N.W.2d 143, 146 (Iowa 1983) (holding property transferred by a spouse to avoid support obligation may be considered on the issue of property distribution as well as alimony).

Michele alleges Ted *indirectly* dissipated their marital assets— rather than depleting the parties' assets, Ted accumulated large amounts of debt. Nevertheless, the result is the same. The parties' assets will eventually be needed to repay Ted's debt.

The parties kept their respective earnings and debt separate for the last several years of their marriage. Ted maintained a line of credit and several credit cards which were all in his name alone. Michele was not aware of the extent of Ted's debt until shortly before she filed her second dissolution petition. At trial, Ted owed approximately $85,633.[5] Ted acknowledged his debt had substantially increased since the first time Michele filed for dissolution in 2001. He said his debt was necessitated by his firm's obligations and household expenses. He attributed the increase to his need to borrow money to service his debt. However, Ted did not provide any evidence concerning his firm's expenses and obligations, nor did he specify his contributions to the household by way of this debt.

While Ted asserted about half of the debt is related to the family household, the record shows Michele paid the vast majority of those expenses for the last several years. Moreover, Ted's claim that he

---

[5]This does not include a substantial loan which is listed on petitioner's exhibit 40 (First MW Line of Credit in the amount of $80,100). There is no discussion of this loan in the decree. Since the parties have not addressed it on appeal, we likewise do not address it.

"ha[s]n't been able to make enough money from the course of [his] practice . . . to cover current expenses and additionally retire the debt on top of that" is contrary to his assertion that his law firm is profitable.

Nevertheless, it is not unexpected Ted could not account for exactly how this money was spent considering the debt accumulated over several years. Ted, however, should have been able to explain how he spent the $22,000 he took out on his credit cards *after* Michele filed her second petition for dissolution. Ted offered no explanation why his debt suddenly accelerated at the end of the marriage although he taunted Michele she was going to have to pay it all. Ted's living expenses did not increase because the parties remained in their home on Barcelona Terrace while the dissolution action was pending. We also know the cash advances were not used to pay Ted's legal expenses because the district court ordered Michele's attorney to transfer half of Michele's $15,000 retainer to Ted's attorney.

It is not appropriate to label all of Ted's debt as waste because we find Ted's testimony credible to prove at least some of this debt benefited the family or Ted's firm. Given the timing of the cash advances and Ted's vague explanation, we find it equitable to set aside $22,000 of debt for Ted. This amount should not be included in the distribution of the parties' assets and debts.[6] Ted failed to prove the cash advances were the result of legitimate household and business expenses. Although all debt is not wasteful, we find this amount unreasonable because he failed to adequately explain it. *See Goodwin*, 606 N.W.2d at 322 (holding $9,000 which the wife spent but could not account for should be

---

[6]Typically, a dissipated asset is included in the marital estate and awarded to the spouse who wasted the asset. *See, e.g.*, *Goodwin*, 606 N.W.2d at 322. However, where the dissipation is debt, it is appropriate to set aside the debt for the spouse who incurred the debt and *not* include it in the marital estate.

included in the division of the parties' assets); *In re Marriage of Hunter*, 639 P.2d 489, 492–93 (Mont. 1982) (holding $51,000 husband withdrew from joint bank account should be included in the marital estate because he produced no evidence to support his claim that the money was spent on business and living expenses). In other words, Michele made a prima facie case for dissipation and Ted failed to rebut it.

In summary, the value of the parties' premarital contributions should be set aside. Ted should receive a $12,000 credit and Michele should receive a $25,645 credit. Additionally, $22,000 of debt should be set aside for Ted. That leaves $866,750 worth of marital assets and $81,824 worth of marital debts to be equally divided. All together, Michele should receive $418,108 and Ted should receive $382,463 based on the following calculations:

|  | Michele | Ted |
| --- | --- | --- |
| Premarital assets | $ 25,645.00 | $ 12,000.00 |
| Marital assets | $ 433,375.00 | $ 433,375.00 |
| Marital debt | $ (40,912.00) | $ (40,912.00) |
| Dissipation debt | $ - | $ (22,000.00) |
| Totals | $ 418,108.00 | $ 382,463.00 |

The district court shall enter an order in conformance with these findings modifying the original decree as follows: the appreciation of Michele's premarital assets should be included in the division of marital property and $22,000 of Ted's debt should be excluded from the division of marital property. These modifications give Michele $28,218 less than the district court's original decree. The district court shall hold a hearing to determine how the parties' property should be redistributed in light of our holdings.

**IV.     Conclusion**

We find no reason to disturb the district court's decision to award primary care of the parties' children to Michele.  We set aside the value of the parties' premarital contributions because both parties asked for at least that much to be set aside.  Because Ted dissipated marital assets through unexplained cash advances on his credit cards at the end of the marriage, we set aside $22,000 worth of debt to Ted.  We order the parties' remaining assets and debts, including appreciation of the parties' premarital assets, to be divided equally.  Costs of this appeal shall be split equally between the parties.

**DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED.**

All justices concur except Hecht, J., who takes no part.