# IN THE COURT OF APPEALS OF IOWA

No. 16-2101
Filed August 16, 2017

IN RE THE MARRIAGE OF LINDA ELIZABETH ROSSOW
AND DANIEL MICHAEL ROSSOW

Upon the Petition of
**LINDA ELIZABETH ROSSOW,**
        Petitioner-Appellant,

**And Concerning**
**DANIEL MICHAEL ROSSOW,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, David M. Porter,

Judge.


        Linda Rossow appeals the physical-care provisions of the decree

dissolving her marriage to Daniel Rossow. **AFFIRMED.**


        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellant.

        Eric G. Borseth of Borseth Law Office, Altoona, for appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**MULLINS, Judge.**

Linda Rossow appeals the physical-care provisions of the decree dissolving her marriage to Daniel Rossow, which ordered physical care of the parties' children with Daniel. We affirm.

## I.     Background Facts and Proceedings

Linda, born in 1986, and Daniel, born in 1980, met in 2005 and married in 2007. The parties have three children, born in 2007, 2009, and 2011. It was the first marriage for both parties. Linda and Daniel began living together in Chicago. They moved to Des Moines in 2009, moved back to Illinois for about a year, and then moved permanently to Iowa in 2011. Both parties live, and the children attend school, in Des Moines.

During the marriage, Linda obtained two bachelor's degrees and a master's degree in "K through 12 school counseling." Linda works as a ninth grade teacher at Lincoln Rails Academy, where she earns $57,000 per year. Daniel obtained an associate of arts degree, and he planned to get a four-year degree. Daniel was interested in attending medical school after obtaining his four-year degree. Daniel worked for Goodwin Tucker, Dish Network, and Life Time Athletic during the marriage. The record reflects most of Daniel's employment changes were precipitated because Daniel's work schedule was not conducive to the family's schedule.[1] He currently works at Athene Annuities, Inc., where he earns $30,000 per year.

---

[1] For instance, when Daniel worked at Life Time Athletic, he was scheduled to work on weekends when he "was supposed to be having visitation with the children, so [he] quit there to get a job that better accommodated the visitation schedule." In addition, Daniel

Throughout the marriage, in part due to Linda's education and employment endeavors, Daniel was responsible for the majority of the children's day-to-day caregiving and household tasks. It is apparent, however, that both parties were greatly involved in the children's lives. Daniel's father, Michael, also provided care for the children on a regular basis, at least three times each week.

Problems between the parties escalated in December 2015, when Daniel acknowledged the parties' relationship was deteriorating and told Linda he wanted to get divorced. They attended counseling sessions. Linda was angry and "blindsided"; she filed a petition for dissolution of marriage on January 5, 2016. Two days later, Linda filed a petition for relief from domestic abuse,[2] alleging Daniel "threatened to hurt me, take assets, has a handgun, has held me down with in the past"; Daniel was "displaying erratic behavior," "screaming" at her, Daniel had engaged in "past physical abuse," emotional abuse and distress"; Daniel did "not value the children's lives"; and the department of human services (DHS) "deemed home unsafe because of" Daniel.[3] The district court entered a temporary protective order that same day.

On February 23, 2016, a temporary order was entered upon agreement of the parties, awarding Linda possession of the marital home and physical care of the children. Daniel was ordered to not enter the marital home without Linda's

worked for Dish Network after Goodwin Tucker, until Dish Network cut his hours "to a point where it wasn't a viable job anymore," so Daniel went back to Goodwin Tucker.

[2] Despite having filed a petition for dissolution of marriage two days prior, Linda answered "No" to the question, "Has there ever been any court case concerning custody of the minor children you have in common with the defendant . . . ."

[3] In December 2015, Linda told her therapist Daniel had been abusive toward her; the therapist reported the allegation to DHS, and a child protective services family assessment was initiated. The assessment did not result in any further action taken on behalf of the agency.

permission. Daniel was awarded visitation Sunday afternoons and Tuesdays after school until 8:00 p.m. until he got an apartment, at which time he was awarded visitation every other weekend and one night during the week. The temporary order also contained a "mutual order of restraint" between the parties. As a result of that agreement, the petition for relief from domestic abuse and temporary order were dismissed.

Trial took place in August 2016. The main issue before the court was which party would receive physical care of the children. Linda appeared pro se and testified on her own behalf. She testified at length about her "reputation," work history, and her ability to provide for the children. Linda testified she never wanted to move to Iowa and she only moved because Daniel wanted to. Linda discussed her numerous family members and friends in Chicago, and she testified her parents had offered to give her their five-bedroom house in Chicago to live with the children. Linda stated the house was in "an excellent school district" in a "fantastic suburb, very diverse." According to Linda, "pending [she] can get a job" in Chicago, she was "looking at doubling [her] salary." Linda requested the court allow her to move to Chicago with the children at the end of the 2016–2017 school year. She stated she "will be very fair with visitation." She proposed that Daniel move to Chicago and have visitation with the children every other weekend. In the alternative, if Daniel did not move to Chicago, Linda proposed she meet him in Davenport with the children "once a month for a whole weekend."

During her direct testimony, Linda did not testify as to specific examples of the "abuse" she alleged Daniel had perpetrated ("I would be reliving the trauma"),

but she stated she had spent the last eight months in therapy "to try to get over that trauma." On cross-examination, Linda stated Daniel threw a dish at her when she was pregnant with their youngest child and he had held her down with a gun five or six years prior. Linda acknowledged she never called the police to report the incidents. Linda acknowledged she told the DHS service provider she did not believe Daniel "would do anything to hurt the children."

Linda also made references to pornography she found on Daniel's computer and stated she was concerned Daniel had sexually abused the children, but when she was questioned further by the court, Linda retracted, stating, "I'm not making any allegations." Linda acknowledged she had taken the parties' two daughters to therapy at two different centers (without notifying Daniel)[4] to explore her concerns of sexual abuse by Daniel, but she had "stopped taking them." During the trial, Linda was found in contempt of court due to her repeated inability to follow the court's directions regarding trial procedure; she refused to allow the witnesses to answer her questions and did not allow Daniel's attorney to complete his questions.

Daniel testified, and he presented testimony from his father, Michael, and the children's elementary-school crossing guard. Daniel denied having engaged in any kind of abuse toward Linda or the children. According to Daniel, the only thing he had threatened Linda with was legal action. Daniel testified, "[T]he last eight months have been literally the most difficult time in my entire life" and, "I can't even imagine what it's like [for the children]." Daniel believed the children

---

[4] Daniel testified he "wouldn't have had any objection" to the children going to a counselor, but he was upset he had not been included.

should stay in the family home and continue attending their current school in Des Moines because they had established "friendships there, a life there." Daniel testified his father had a "very strong" relationship with the children and had been "integral in helping [he and Linda] take care of the kids since they were born." In contrast to Linda's testimony, Daniel stated Linda did not have a close relationship with her family, and that during the parties' marriage, Linda's parents had visited the family "once." Daniel testified he had recently resurrected a relationship with his mother, from whom he had become estranged during the parties' marriage due to a dispute between his mother and Linda, after which Linda had "made it pretty clear [she] didn't want [Daniel's] mother in [their] lives."

Daniel believed it would place a "big challenge" on his relationship with the children if the children moved to a different state and that such a move would have a "very negative effect" on the children. With regard to his relationship with Linda, Daniel testified he "can work with her" to co-parent, and that he was able to create a stable environment for the children.

In November 2016, the district court entered its decree, ordering joint legal custody of the children and physical care to Daniel with liberal visitation to Linda (as the parties agreed or, if unable to agree, every other weekend and one weeknight per week). The court ordered Linda to pay child support in the amount of $958.25 per month. The court distributed the marital assets[5] and declined to award either party attorney fees. Linda appeals, seeking physical care of the

---

[5] In part, the court awarded Daniel the marital home and ordered him to make an equalization payment to Linda in the amount of $5000—a setoff of Daniel's share of Linda's IPERS account from Linda's share of the net equity in the home.

children.  Daniel resists, and both parties seek an award of appellate attorney fees.

## II.     Scope and Standard of Review

We review dissolution cases, which are tried in equity, de novo.  Iowa R. App. P. 6.907; *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483–84 (Iowa 2012).  While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them.  Iowa R. App. P. 6.904(3)(g).  "Precedent is of little value as our determination must depend on the facts of the particular case."  *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

## III.     Physical Care

Linda appeals the district court's decision placing the children in Daniel's physical care.  At trial, both parents requested physical care, and neither requested shared physical care in the alternative.[6]  "Physical care" involves "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child."  Iowa Code § 598.1(7).  We consider a number of factors in determining which parent should have physical care of a child.  *See id.* § 598.41(3); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974).  The fundamental goal in determining physical care of a child in an action for dissolution of marriage is to place the child in the care of the parent who will likely accommodate the long-range best interests of the child.  *Winter*, 223 N.W.2d at

---

[6] The court must consider joint physical care if requested by either party, *see* Iowa Code § 598.41(5)(a) (2015).  Here it was not.  Although in his answer Daniel requested shared physical care, or in the alternative, physical care with him, he abandoned the request for shared physical care at trial.

167. "[T]he basic framework for determining the best interest of the child" is well established. *In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007); *see* Iowa Code § 598.41. Generally, stability and continuity of caregiving are important considerations. *Hansen*, 733 N.W.2d at 696. Finally, "[t]he objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

Linda contends she should be awarded physical care of the parties' children. To support her contention, Linda claims: the district court provided "no findings of fact" supporting its physical-care decision but for its finding that Linda would potentially deny the children's opportunity for maximum continuing contact with Daniel; the court's conclusion that she would potentially deny the children's opportunity for contact with Daniel "is not supported by the record and wrong"; and placing the children in her physical care is in the children's best interests, whereas placing the children in Daniel's physical care is not in the children's best interests. In sum, Linda asserts the record does not support the district court's order of physical care to Daniel.

The court set forth the following finding supporting its order of physical care of the children with Daniel:

> Of paramount concern for this court is the potential for denial by Linda of the children's opportunity for maximum continuing contact with Daniel, without just cause. Accordingly, the court finds this decree provides the children with the best opportunity for the maximum continual physical and emotional contact with both parents, and will encourage the parties to share the rights and responsibilities of raising the minor children.

(Citation omitted.)

"The parent awarded physical care is required to support the other parent's relationship with the child." *Hansen*, 733 N.W.2d at 700 (citing Iowa Code § 598.41(5)(b) ("The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement.")). "In making this decision, the factors of continuity, stability, and approximation are entitled to considerable weight." *Id.*

On our de novo review, we find the physical care determination is supported by the parties' respective past history of caregiving and the desire for continuity and stability in awarding physical care to Daniel. Daniel was primarily responsible for the children's care prior to the parties' separation. The children were described as "intelligent" and involved in a number of activities, including football, dance, soccer, Girl and Boy Scouts, and religious education. The crossing guard at the school described the children as "very well-mannered" and "always dressed appropriately for the weather." She testified Daniel walked the children across the street "[e]veryday," the children always stayed right by him, and he "was always early." Daniel testified he felt it was important for the children to remain in the school district "to keep from upsetting what they've established so far as much as possible." Daniel's father, Michael, was a key figure in the children's lives. Michael supported Daniel as the children's primary caretaker and testified he believed Daniel would work with Linda to co-parent the children effectively. The record shows Daniel has tried to work together with Linda to resolve issues in the best interests of the children.

In contrast, Linda's testimony and journal entries[7] can only support the conclusion that Linda has no desire to co-parent with Daniel or support Daniel's role as the children's father. For instance, in her journal, Linda wrote she wanted to get "[a]way from Daniel who tells the kids he is well, but he is not," and:

> I want to win on Tuesday and get away from him. The kids will get away from him. Know that is horrible to say. I shouldn't talk that way, but given he is a sick person. . . . I really want the kids to love their dad, but I hate him and I will take the kids and get away from him.

At trial, when discussing possible visitation schedules for Daniel upon her proposed move to Chicago, Linda stated, "[O]ther than [Daniel] moving out there—*which, quite honestly, I don't see happening*—I would be willing to meet him in Davenport once a month for a whole weekend." (emphasis added).

Linda's actions also speak to her intent. When Linda registered the children for the 2016–2017 school year she did not provide the school with Daniel's information as a parent. Linda did not inform Daniel when she took the children's daughters to therapy. Linda cancelled Daniel's cell phone in December 2015 and his debit card in January 2016. She also removed Daniel from her health insurance, despite the temporary order directing her to continue Daniel on her insurance. Linda left with the children for hours on end and avoided Daniel's questions regarding their whereabouts when she knew he was planning on spending time with the children.

We are aware Linda's behavior during these proceedings was likely more extreme given the hostility she garnered toward Daniel after he presented her with the topic of divorce. But the cynical—if not cryptic—nature of her actions

---

[7] Linda submitted her journal entries as evidence at trial.

and statements are deeply concerning when considering whether Linda is capable of separating her personal animosity toward Daniel to act in the best interests of the children. In contrast, the court clearly found Daniel's testimony credible that he tried to remain positive and supportive about Linda in front of the children.

The overriding concern is the best interests of the children. Iowa R. App. P. 6.904(3)(o); *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992). We conclude it is in the children's best interests to be placed in the physical care of Daniel. Upon our de novo review of the record and the nonexclusive factors set forth in section 598.41 and Iowa law, along with a careful study of the issues raised by Linda on appeal, we affirm the physical-care decision made by the district court.

## IV.    Attorney Fees

Both parties seek attorney fees for this appeal. An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). In determining whether to award attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* In consideration of these factors, we decline to award appellate attorney fees to Linda, and we award appellate attorney fees to Daniel in the amount of $2000. Costs on appeal are assessed to Linda.

**AFFIRMED.**