**IN THE COURT OF APPEALS OF IOWA**

No. 24-0586
Filed April 9, 2025

**IN RE THE MARRIAGE OF NICHOLE MIRAS MORDINI
AND JOHN LEN MORDINI**

**Upon the Petition of
NICHOLE MIRAS MORDINI,**
        Petitioner-Appellee,

**And Concerning
JOHN LEN MORDINI,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Christopher Kemp,

Judge.


        The respondent challenges provisions of the decree dissolving his marriage

to the petitioner.  **AFFIRMED.**


        John L. Mordini, Carlisle, self-represented appellant.

        Lora L. McCollom of McCollom Law, PLLC, West Des Moines, for appellee.


        Considered without oral argument by Tabor, C.J., and Greer and Buller, JJ.

**GREER, Judge.**

John Mordini appeals the decree dissolving his marriage to Nichole (Nikki) Miras Mordini. He argues (1) he should have been awarded traditional spousal support because the parties were married more than twenty years and have a large discrepancy in annual income; (2) he should be awarded half the value of Nikki's retirement accounts; (3) debts he incurred in the lead-up to the dissolution trial should have been considered marital and divided between the two parties; and (4) "errors of law at trial and bias by the [district court] evidenced in the . . . decree of dissolution of marriage violated his due process rights and prevented him from receiving an equitable proceeding." Nikki asks that we affirm the dissolution decree and award her $15,000 in appellate attorney fees. On our de novo review, we decline to award appellate attorneys and affirm the district court's decision.

**I. Background Facts and Proceedings.**

John and Nikki married in 2003; they have three children, born in 2003, 2005, and 2007, respectively. Nikki petitioned to dissolve the marriage in 2023. At the time, Nikki worked as a sole practitioner in her own law firm. Her practice focused mostly on immigration law. John was also self-employed with his own business; he worked in the construction field, as he had for nearly thirty years. John started in the industry by completing framing and installing countertops, but by the time of the dissolution trial in 2024, his work focused on intricate specialty projects, at which he excelled.

Before the dissolution trial, the parties agreed to joint legal custody and physical care of their two children who were still under the age of eighteen. They also stipulated to some division of property, including family vehicles, personal

property, and bank accounts. Nikki agreed that she would provide health insurance for the children.

Following a two-day trial, the district court issued a dissolution decree. The court determined Nikki's expected gross annual income was $110,000; it reached this number by averaging four years of income. As for John's income, the court noted:

> John offered very little credible evidence as to what he actually earns from his business. He testified about ailments that he believes hinder his ability to work, but those were essentially self-assessments on his restrictions. John has historically been able to pay the mortgage, cars, telephone bill for the family, as well as cover meals and incidentals for himself. Even using the conversative mortgage payment of $2000.00 per month, that combined with car payments ($500.00), telephone bill ($550.00), gas and oil for cars ($870.00) and meals ($1000) put him at approximately $5000.00 in monthly expenses that he has historically been able to cover through his self-employment.

The court relied on information from the report of John's expert witness, who was hired to provide a "vocational assessment and evaluation report," that John "works a varied schedule, 20–30 hours per week. His main income is at an hourly rate. He charges $75–85 hourly rate or a flat rate of $300–500 for certain projects." Using this information, the court set John's annual income at $50,000, noting, "He can earn $50,000 per year by working just under thirteen hours per week, at the rate of $75.00 per hour rate." These amounts were used to determine Nikki's child-support obligation, which was set at $427.35 each month while two children were eligible and $303.05 each month when only one child was eligible.[1]

---

[1] The district court originally found different amounts were appropriate. After granting in part Nikki's motion to enlarge and reconsider, the court considered the health insurance premiums Nikki paid for the children and reduced her child-support obligation to the amounts listed.

The court rejected John's request for traditional spousal support. While the parties were married slightly longer than twenty years, each party was approximately fifty years old and had similar mental-health diagnoses. John listed several physical ailments as well, but he "ha[d] not sought disability, nor [had] any of his healthcare providers placed any restrictions on his ability to work." And "John voluntarily decided not to take [his prescribed mental-health] medication starting in March 2023." The parties agreed that Nikki would keep the marital home, with John receiving a cash payment for his half of the equity. The monthly mortgage payment on the home was approximately $3400 at the time of the trial—before Nikki refinanced to access home equity to pay John the equalization payment. Additionally, the court reasoned:

> [T]he parties have clearly been living above their means, especially recently. Nikki has had to draw from her 401k to catch up on the mortgage payments, and the parties have taken on significant debt. Removing the double counting of the mortgage payment, which is listed on both financial affidavits, the parties assert they spend over $250,000.00 per year in expenses. They have devoted significant funds toward their children's activities and made sacrifices in their careers and with their finances to support the children's endeavors. Nikki does not currently own a vehicle that she drives; she has allowed [one of the children] to drive [her] car since the child's car stopped working in July 2023. John has purchased or is purchasing a car for the parties' adult child . . . who is a sophomore at Iowa State University.

Considering all of the relevant criteria, the district court concluded Nikki did not have the ability to pay John spousal support.

Regarding the property division, the court considered all listed assets and debts. It removed the value being held in Nikki's client trust account from the pool of marital assets. It also determined six separate loans either Nikki or John had taken out in the lead-up to the dissolution trial were not going to be considered as

marital debt—John was individually responsible for the $151,612.05 he claimed to have borrowed from friends and family, and Nikki was responsible for the $23,600 she similarly borrowed. The court determined the family home was worth $740,000—the greater value from the two appraisals—and set values for each spouse's business assets. In the end, the court concluded the marital property had a value of $489,122.33; this total included Nikki's retirement accounts, which were worth approximately $70,000. The court awarded each party various assets and debts while tracking the value. Nikki was awarded $438,723.00 of marital assets, while John received only $50,399.33. To make up the difference in value, Nikki was ordered to pay John an equalization payment of $194,161.84 within 180 days of the decree (so each party ended up with $244,261.16 in marital assets). Each party was ordered to pay their own attorney fees.

John appeals.

## II. Standard of Review.

"An appeal regarding the dissolution of marriage is an equitable proceeding." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015); *see also* Iowa Code § 598.3 (2023). We review equitable proceedings de novo. *Gust*, 858 N.W.2d at 406. And applying de novo review means "[w]e review the facts and law, and adjudicate once again those issues properly preserved and presented." *In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995).

## III. Discussion.

### A. Motion to Strike.

After the parties filed their appellate briefs, Nikki moved to strike "statements of facts in [John's brief that] fail[ed] to include references to the record which

support each alleged factual statement" and "additional purported facts, as well as unnecessary editorializing, which fail[ed] to specifically reference any portion of the record that support the assertions" in the argument sections. John resisted, and our supreme court ordered the issue to be submitted with the appeal before transferring the case to this court.

Nikki's motion did not identify any specific "facts" or statements that she believed should be struck. And we will not comb line by line through John's brief to determine if any run afoul of our appellate rules. *See* Iowa R. App. P. 6.903(2)(a)(6) (requiring each statement of fact to be supported by a specific reference to the record); *see, e.g.*, *In re A.T.*, No 21-0720, 2021 WL 3378851, at *1 (Iowa Ct. App. Aug. 4, 2021) (refusing to reach the merits of a claim when doing so would require the court to comb through the facts to support one party's argument, which is assumption of a partisan role). So, we exercise our discretion to not grant the motion to strike. However, we reiterate that our review is de novo, which means we review the entire record as part of consideration of the issues raised on appeal. *See Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024). And it is the record developed in the district court—not errant statements in appellate briefs—on which we base our decisions.

**B. Traditional Spousal Support.**

John challenges the district court's denial of his request for traditional spousal support. John asked the court to order Nikki to pay him $2500 each month until he remarried or died.

"Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case." *In re Marriage of*

*Mills*, 983 N.W.2d 61, 67 (Iowa 2022). "The goal in awarding alimony is to do equity." *Id.* at 71 (citation omitted). In deciding whether it is equitable to award spousal support, Iowa courts are to consider the criteria listed in Iowa Code section 598.21A(1). *See In re Marriage of Sokol*, 985 N.W.2d 177, 185 (Iowa 2023). "An award of traditional spousal support," which is what John requested, "is equitable in marriages of long duration to allow the recipient spouse to maintain the lifestyle to which he or she became accustomed." *Id.* "Generally, only 'marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support.'" *Id.* (quoting *Gust*, 858 N.W.2d at 410–11).

John highlights the $60,000 difference in the parties' annual incomes as determined by the district court ($110,000 for Nikki and $50,000 for John) in support of his argument the district court got it wrong. But we reject the district court's income determination for John.[2] One week before the dissolution trial, John's expert created a report—based on information John told her—stating he worked "20–30 hours per week" and charged "$75–85 hourly rate." Even using twenty hours per week and the lesser hourly amount of $75, John would gross $78,000 annually. At thirty hours per week charging $75 per hour, John would gross $117,000 annually—more than Nikki's annual income. Based on John's statements to his vocational expert, his earning potential is not less than Nikki's.[3]

---

[2] Neither party asked us to review the child-support award. So, while we disagree with the district court's determination of John's income, we do not modify the child-support provision.

[3] The vocational expert opined that John's earning capacity was between $14 to $20 an hour on a part-time basis, but the district court placed "little-to-no weight" on the expert's opinions. We agree with that assessment.

*See Gust*, 858 N.W.2d at 411 ("In determining need, we focus on the earning capability of the spouses, not necessarily on actual income. . . . In order to establish earning capability for persons without work experience or who are arguably unemployed, the parties may use vocational and other experts to assist the court in making the determination."). We also consider that during the years of the marriage, John paid from his earnings family expenses that totaled approximately $5000 each month, suggesting his income stream was more favorable than he testified.

While both John and Nikki were employed outside the home throughout their marriage, they chose to prioritize family time over maximizing their earnings—as is their right. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007) ("[W]e have never held or even insinuated that spouses should maximize their earning potential or risk being punished in the distribution of the parties' property. Iowa is a no-fault state."). Neither party appears to have worked up to his or her earning capacity, and we recognize the ramp-up of Nikki's new firm might cause her to earn less in the short-term. But this is not a situation where John is suffering economic consequences because he focused his time and energy on the family while Nikki was the breadwinner. *Cf. Gust*, 858 N.W.2d at 410 (recognizing awarding traditional spousal support may be equitable "when the parties agree a spouse should stay home to raise children[ because] the economic consequences of absence from the workplace can be substantial").

Here, where each party's earning capacity is not as disparate as claimed and where each party has consistently maintained employment outside the home

throughout the twenty-year marriage, we agree with the district court that an award of traditional spousal support is not warranted.

### C. Property Division.

John challenges the district court's property division. "Under our statutory distribution scheme, the first task in dividing property is to determine the property subject to division." *Fennelly*, 737 N.W. 2d at 102. "The second task is to divide this property in an equitable manner according to the enumerated factors in section 598.21 of the Iowa Code." *Id.* "Although an equal division is not required, it is generally recognized that equality is often most equitable." *Id.* (citation omitted).

Here, John argues the district court was wrong to remove the personal loans he took out leading up to the dissolution trial from the pool of marital property to be divided. And he challenges the division of Nikki's retirement accounts as inequitable. We consider each in turn.

**John's Debts from Personal Loans.** At trial, John introduced evidence he had taken four personal loans totaling $151,612.05. According to John, he borrowed the following:

|  | Loaner | Loan Date | Amount Borrowed | Still Owed |
|---|---|---|---|---|
| Loan I | Client W | November 2021 | $15,000.00 | $15,000.00 |
| Loan II | Client H | May 2022 | $17,000.00 | $18,700.00 |
| Loan III | Brother | September 2022 | $20,000.00 | $19,273.37 |
| Loan IV[4] | Paramour | May 2023–February 2024 | $98,368.68 | $98,368.68 |

---

[4] The paramour testified at trial that she wrote a check for an additional $10,000 to pay toward John's attorney fees the day before trial, for which she also wanted to be reimbursed. That additional $10,000 was mentioned in the factual recitation of the district court but not included in the spreadsheet of debts and assets. And in his appellate brief, John refers to the loan for $98,368.68, so we use that amount in our discussion.

In support of Loan I, John introduced a document containing one sentence, stating the loan was for $15,000 and was interest free. The document appeared to be signed by John and his client who loaned him the money—it was not notarized. There was no payment schedule or due date for the loan. There was also no indication whether any payments had been made since November 2021. As further support, John provided a copy of an undated text message he sent to his client asking for $7000. But we read the request for cash to be an advance on future work to be completed as opposed to a loan arrangement.

For Loan II, John introduced into evidence a typed paragraph that appeared to be signed by each party. It was not notarized and, by its written terms, the debt was to be paid by August 2, 2022. Again, the status of the loan was unclear from the documentation provided, but the parties had borrowed from this person, a "long-time client" of John's, in the past. In support of Loan III, John introduced a print-out from an online bank account. The print-out did not include any identifying names or details; it showed someone took an advancement of $20,000 in September 2022 and that a principal balance of $19,273.37 remained as of the printing date, which appeared to be February 28, 2024. John testified his brother borrowed this money for John's benefit. For Loan IV, John provided a handwritten document that included a list of dates, forms of payments, who the payment was to (John, his business, his divorce attorney, etc.), and the amount. The document was unsigned and did not include any promise to pay or loan terms. At trial, John testified the list showed "money from [his paramour]."

When considering the purported loans, the court stated in the decree:

John did not call [Client W], [Client H], or his brother to testify about the purported loans. [Client W] and [Client H] are longtime clients of John and [John's business]. [Client W] has John work on his rental properties. The loan documents from [Client W] and [Client H] are single paragraph documents, not notarized nor including specific terms. The loan from his brother is just a bank statement printout regarding a line of credit. John was asked to provide documentation regarding loans in the discovery process, but did not produce the documents until he filed them as proposed exhibits on the eve of trial. Page 2 of [an exhibit] is an undated text message in the loan from [Client W] states John is an "advance" of $7000 that is not a long term loan, just something John would use against his invoices for the next couple of months instead of getting paid. John did not call [Client W] as a witness, and did not explain any details relating to this transaction that he has categorized as a "loan" which Nikki should be responsible for repaying half of. Nikki testified that when they [were] previously loaned money from [Client H], he required both her and John to sign the document, and it was a formal document that looked like something from the Iowa Bar Association templates.

The "loan agreement" between John and his paramour is simply a running tab on a notebook page that lists money [the paramour] provided John for certain amounts on specifics dates. It is not signed by either party, nor are there any terms of repayment. Additionally, there is one payment made directly to John's attorney, and John testified that [his paramour] paid his attorney around $45,000.00. John requests Nikki be responsible for half of these fees paid through the "loan" and also be responsible for John's attorney fees.

. . . .

. . . The Court finds based on the hearsay nature of the purported loans, the lack of disclosure prior to trial, the lack of specificity, and ultimately, what is equitable, each party shall be responsible for repayment of their own personal loans.

Additionally, in another part of its ruling, the court stated that "John tended to exaggerate some of his claims that would be advantageous to him."[5]

---

[5] The court did not specifically link this statement about John's credibility to the personal loans. Rather, the court referenced that John's conflicting testimony that Nikki's phone was "under harder lock and key than the CIA's most important documents" and that he learned she was engaged in an extramarital affair by going through her phone, that she could earn $250,000 to $300,000 per year and would begin as soon as the dissolution was over (even though her greatest salary was less than $160,000 and occurred in 2012), and that their home was worth $850,000

The court removed the personal-loans debt from the marital property division—it was not factored into what either party ultimately received. In other words, to the extent the debt from John's outstanding loans existed, John received $244,561.17 of marital property minus the debt from the personal loans of $151,612.05 (for a total of $92,949.12). It also removed $23,600 of personal-loan debt Nikki claimed.

A district court cannot simply exclude assets or debts from the property division.[6] "Under our statutory distribution scheme, the first task in dividing property is to determine the property subject to division. . . . *Our statute is written to define divisible property as 'all property' of the parties*, other than the two classes of excluded property," which are inherited property and gifts received by only one party. *In re Marriage of Shriner*, 695 N.W.2d 493, 496 (Iowa 2005) (emphasis added)); *see also In re Marriage of Sullins*, 715 N.W.2d 242, 251 (Iowa 2006) ("Debts of the parties normally become debts of the marriage . . . ."). That is not to say a district court cannot assign each party responsibility for their own debts and ultimately end up with an unequal property distribution. *See In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013) ("An equitable distribution of marital property, based upon the factors in [section] 598.21(5), does not require an equal division of assets."); *see also Sullins*, 715 N.W.2d at 251 ("Even though a debt may have been incurred by a party for family expenses, it is not inequitable to order that

___

to $900,000 even though the two appraised values (including one from his appraiser) were $720,000 and $740,000.

[6] The district court could have "set aside the debt for the spouse who incurred the debt and *not* include it in the marital estate" if it concluded the debt from John's personal loans was dissipation of marital assets. *Fennelly*, 737 N.W.2d at 106 n.6. But the district court did not do so.

party to be responsible for the entire amount of the debt as long as the overall property distribution is equitable."). To that point, we cannot accept a district court's division of property when it excludes debt from the marital estate, uses an incomplete pool of marital property, and divides that number in half as an "equal property division."

That said, we do not think that is what happened here. While not explicitly stated, it seems the district court excluded John's claimed debt because it concluded the existence of the debt was too uncertain to be fairly included as marital property and then, as to Nikki's personal-loan debt, relied on Nikki's request to give each party responsibility for their own family and friend debt. In other words, while John testified he had outstanding debt on these loans and provided some written documentation to support their existence, the district court found this evidence lacked credibility—either to whether the loans took place, the amount still owed, or what John used the funds for. *See In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2007) ("Attorneys' fees incurred in dissolution proceedings are not marital debt."). The district court is required to include all marital assets and debts not subject to exclusion as part of the marital property to be divided, but first it was John's burden to establish the debt existed. *See* Iowa R. Civ. P. 6.904(3)(e) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established."). Following our de novo review, we conclude John failed to establish a marital debt of $151,612.05 from personal loans. So, it was appropriate to exclude it from the division of marital property.

**Nikki's Retirement Accounts.** John argues Nikki should not have been allowed to keep her retirement accounts, claiming he is entitled to half because

marital funds were used to invest in the accounts and the growth took place during the long marriage. As part of this same claim, John maintains Nikki dissipated marital assets by "covertly" liquidating a substantial portion of her retirement account before the dissolution trial.

First, we consider error preservation. Nikki does not challenge whether John properly preserved error, but we may raise the issue sua sponte. *See Top of Iowa Coop v. Sime Farms, Inc.* 608 N.W.2d 454, 470 (Iowa 2000) ("In view of the range of interests protected by our error preservation rules, this court will consider on appeal whether error was preserved despite the opposing party's omission in not raising th[e] issue at trial or on appeal."). John never explicitly made a dissipation argument to the district court and, even if he did, he never got a ruling on the issue. Without a ruling on this issue, we have nothing to review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.); *see also In re Marriage of Moss*, No. 21-0307, 2022 WL 1232619, at *2 (Iowa Ct. App. Apr. 27, 2022) (refusing to consider dissipation claim that was not first made to and ruled upon by the district court). We do not consider the dissipation claim further.

But we still consider whether the district court equitably divided Nikki's retirement accounts. John argues the district court wrongly divided the retirement accounts, arguing he asked for them to be divided equally but the court ordered each party to "only receive retirement or investment accounts in their name." As Nikki points out in her appellate brief, John's argument is based on a faulty foundation—John did, in fact, receive half the value of Nikki's retirement accounts

in the full calculation of net assets. Nikki was awarded her retirement accounts, but they were still considered marital property. So while the court placed the Principal 401(k) worth $63,115.37 and the Edward Jones IRA worth $6674.10 on Nikki's side of the ledger, John was still ultimately awarded half of their value once the court determined the total value of marital assets, awarded John half, and ordered Nikki to make an equalization payment of $194,161.84 to effectuate an equal division.

There was no testimony what made up the value of Nikki's retirement accounts—stocks, bonds, mutual funds, etc. And it is true that Nikki was not ordered to give John half of those investments. But as we understand John's argument on appeal, that is not his complaint. He does not assert he should have received half of Nikki's retirement accounts in their non-liquidated form.

Because we do not consider the merits of John's unpreserved dissipation-of-assets claim and John equitably received half the value of Nikki's retirement accounts, we affirm the district court's property division as it relates to Nikki's retirement accounts.

### D. Due Process Claim.

Next, John "asserts errors of law at trial and bias by the [district court] evidenced in the . . . decree of dissolution of marriage violated his due process rights and prevented him from receiving an equitable proceeding." John uses this section of his appellate brief to point out what he believes are incorrect factual findings. From there, he makes the logical leap that, because the factual findings are different than what he believes the evidence at trial established, the district court must have been biased against him and refused to apply the law fairly. This

part of John's brief is generally without citations to the record, *see* Iowa R. App. P. 6.903(2)(a)(6), citations to authority, *see* Iowa R. App. P. 6.903(2)(a)(8)(3), or a cogent legal argument that was raised to and decided by the district court. Because the legal argument is neither sufficiently developed to enable our review nor properly preserved, we do not consider it further. *See State v. Alderman*, No. 19-0278, 2020 WL 2987992, at *6 (Iowa Ct. App. June 3, 2020) ("The appellant must develop arguments and cite authority to enable our review of the decision made by the district court."); *In re Est. of DeTar*, 572 N.W.2d 178, 180 (Iowa Ct. App. 1997) ("Iowa law dictates that [an unrepresented party's] brief is judged by the same standard as a brief filed by an Iowa lawyer.").

### E. Appellate Attorney Fees.

Nikki asks that we award her $15,000 in appellate attorney fees. "[W]e have discretion to award appellate attorney fees." *In re Marriage of Samuels*, 15 N.W.3d 801, 808 (Iowa Ct. App. 2024). "When deciding whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (cleaned up). While we affirm the district court's decree, we do not think John has the ability to pay Nikki's attorney fees. So we deny her request.

## IV. Conclusion.

Because we refuse to conduct a line-by-line review of John's appellate brief for compliance with the Iowa Rules of Appellate procedure, we exercise our discretion to deny Nikki's motion to strike. We affirm the dissolution decree but deny Nikki's request for attorney fees.

**AFFIRMED.**