# IN THE COURT OF APPEALS OF IOWA

No. 23-1912
Filed September 18, 2024

IN RE THE MARRIAGE OF NICOLE SARAH SHADA
AND CHRISTOPHER DAVID SHADA

Upon the Petition of
**NICOLE SARAH SHADA,**
        Petitioner-Appellee,

**And Concerning**
**CHRISTOPHER DAVID SHADA,**
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Harrison County,

Craig M. Dreismeier, Judge.


        A husband appeals the physical-care provisions of the decree dissolving his

marriage.  **AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**


        Krisanne C. Weimer of Weimer Law, PC, Council Bluffs, for appellant.

        Michael J. Winter, Council Bluffs, for appellee.


        Considered by Badding, P.J., Langholz, J., and Mullins, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**BADDING, Presiding Judge.**

On appeal from the decree dissolving his marriage to Nicole Shada, Christopher David Shada (David) challenges the district court's decision to place their three minor children in Nicole's physical care. He argues that Nicole "is not supportive of the children's emotional needs, she is profane in her communications with the children and does not support the children's relationship with [him]." The court discussed those issues but found they were outweighed by Nicole's role as the children's primary caretaker. We disagree on our de novo review of the record and modify the decree to place the children in David's physical care.

I.    **Background Facts and Proceedings**

David and Nicole married in 2011. Nicole petitioned to dissolve the marriage in March 2023, and a trial was held in October after an unsuccessful attempt at mediation. While the divorce was pending, the parties continued living together at the family's acreage with their three children: daughters born in 2009 and 2010, and a son born 2016.

The oldest two children are involved in almost everything, according to Nicole—show choir, softball, track, cross country, school clubs, volleyball, and basketball—while the youngest is involved in just baseball so far. Nicole estimated the children have activities five to six days each week. And she maintained that she was the parent getting them there and attending the activities "99.9 percent" of the time.

Nicole described herself at trial as a stay-at-home mom. She was in her last semester of college when the oldest child was born. Nicole left school to stay home with the child, but she soon picked up a part-time bartending job. For most

of the marriage, she worked every weekend from Thursday through Sunday, usually from 6:00 p.m. until the bar closed.  While Nicole was working, David cared for the children.  In 2023, Nicole started working as a paraeducator in the children's school district.  She kept her bartending job but dropped the Thursday shift.

David obtained his bachelor's degree before the children were born and a master's degree during the marriage.  He is employed as a clinical trauma therapist.  While David previously had a heavy case load, he has reduced the number of clients that he sees over the last few years.  He typically works from 9:00 a.m. until 5:00 p.m., although he will at times provide some evening appointments.  David has offices in the different towns where he sees clients, but he testified that he does most of his non-therapeutic work, like case notes and treatment planning, at home: "I'll just do it at the dining room table so I can be within earshot of all the kids and listening [to] what's going on."

Nicole had a different perspective.  She maintained that David has a gambling problem and spends more time at the casino than with the children, attending "[l]ess than 5 percent" of their activities and not coming home at night until between 10:00 p.m. and 5:00 a.m., or sometimes not at all.  David is a Diamond Club member at a local casino and, according to Nicole, he also goes to Las Vegas about six times per year because "[h]e likes to party and do his drugs out there."  Nicole testified that she registers the children for school, helps them with their homework, and attends their parent-teacher conferences, while David doesn't participate in any of those things.  Nicole maintained that David played no part in raising the children, at least until the last several months before the dissolution trial, during which she said he became "super dad."

David denied Nicole's characterization of his lifestyle and involvement with the children. He said that he had only been to Las Vegas twice in the past year—one of those times was with his extended family for his fortieth birthday—and his history of going to the local casino and occasional use of recreational drugs like marijuana and ecstasy also involved Nicole. David explained that his Diamond Club membership status, which Nicole shared, came from their credit card, where purchases earned points toward membership. With their status, David testified they can eat for free at the casino, which he would do maybe two to three times per week. He agreed there were times when he wouldn't come home at night but stated that was rare, maybe twice over the last three months, when he stayed at his friend's house. He also stated that Nicole would sometimes stay out all night too. And while Nicole complained about David's gambling, she had more gambling points on the credit card than David some months. Nicole also acknowledged on cross-examination that she had started playing poker every Tuesday night, sometimes until 1:00 a.m., and she admitted using recreational drugs with David.

According to David, in the early days when the children were young, he "would do just as many roles as [Nicole] the whole time, everything from feeding bottles to changing diapers to cleaning their rooms for them [and] caring for them, taking them to the park." He explained: "It's almost difficult to point out everything that I did because I did just as much stuff as she did a hundred percent." Throughout the marriage, David said that he did most of the household chores, laundry especially. As for the children's activities, David agreed he hasn't attended every one, but he submitted that he "went to a majority." And he said that on the weekends when Nicole was bartending, he attended tournaments with the

children.  Or if she took off work to go to the tournaments, he would stay home with their youngest.  He also said that they used to split taking the children to and from school before Nicole started working at the school.  But David agreed Nicole usually handled the parent-teacher conferences solo and took charge of buying the children's clothes.

Nicole shared her negative opinions about David with the children.  In a group text with their daughters, when David messaged Nicole about taking the children to the mall, she replied, "Look at you go super dad."  In another, Nicole told the middle child that she wouldn't have to babysit her brother "if u[r] dad just came home like any other father i[n]stead of hanging out and drinking with his low life druggy 'friends.'"  When David replied, "Totally not appropriate to be texting," and asked her to stop, Nicole shot back with, "Nothing but facts u super father."  The next month, Nicole texted the girls and David, "All the laundry I did is sitting in baskets downstairs . . . don't worry girls I also do laundry too lmfao."  The middle child asked, "Who said you didn't?"  And Nicole replied, "Ur father to his attorney."  And in another exchange, Nicole texted the oldest child: "are u okay watching ur brother again this weekend and being home alone while I'm at work and your dad goes out and drinks and doesn't come home again and stays elsewhere until I don't get home till 230 am knowing u have a big tournament . . . [t]omorrow[?]"  David replied, "Yes she said that's fine.  And you've already said it's ok."  After Nicole answered, "I just need her to sign the paper u went out again so I'm just making sure :)," the oldest child jumped in, "Nope leave me out of this."

Beyond these and other similar text messages, David alleged that Nicole once told the children that he "was out fucking hoes."  And he testified that just two

days before trial, the youngest child told him, "Mom says you're trying to sell the house and sell all the animals, and I really like my cat." David assured the child that "your mom and I both want you guys to be able to stay in the house." Nicole unapologetically agreed at trial that she has undermined David's discipline of the children and said things in front of them about David wanting to sell the house, not being an involved parent, drinking with his friends, and using drugs. David testified that when he asks her to not say those things in front of them, Nicole will reply, "This is the truth. They need to hear this."

Nicole's harsh communication was not limited to David. Multiple witnesses testified about times they saw Nicole "cussing and yelling" at David or the kids. Nicole admitted at trial, "I'm a yeller," which is apparent even in her text messages. As just one example among many, Nicole texted the oldest child during a softball game, berating her for missing a catch: "What the fuck!!! That was ur god damn ball out there . . . how embarrassing." When the child sent David a screenshot of the message, he replied, "Good try honey. See you back at home and love you." In other messages, Nicole will text the children to "[l]et the god damn dog in now" or "[g]et the F off my fn headphones. . . . Now damnit."

David testified the children often asked him for advice: "We have a really good relationship. . . . If they struggle with friendship stuff, they'll come talk to me. If they're struggling with their mom, they'll come talk to me." Text messages between David and the children confirmed this. In one, the oldest child told David about a comment Nicole made to her in a dressing room, and David replied, "Well she love[s] you dearly. She just wants you to do well and enjoy homecoming." And when the middle child told David that Nicole "freaking ruins my life" and doesn't

love her, David replied, "She was just stressed probably. . . . She loves you." After David's counsel uploaded these text messages as exhibits for the trial, David said the middle child contacted him in a panic because, while the children were at school, Nicole had texted them "something like, you know, 'why you guys talking shit on me.'" The child was so upset that David "had to basically walk her through just getting her to the point where we could get her to the counselor's office because she was going into the bathroom and hiding away and crying."

Nicole dismissed these concerns at trial and asked for the children to be placed in her physical care, explaining:

> For 10-plus years I've taken my kids to and from school every single day while he's still in bed. Every morning I get up at 6:00 a.m. to take my daughter to cross country or softball, and then pick her back up at 8:00 a.m., and then back to the bus barn by 9:00 so she can go play softball for 8 hours, then back up from the high school at midnight. 54 games for [the oldest] child playing JVR, JV, and varsity. Her dad came to a half of one game. 54 games.

Yet one of Nicole's witnesses, a fellow softball mom, testified that she has seen David at the oldest child's softball games with Nicole and by himself. She also agreed that while Nicole was "the one that gets them where they need to go," David had "done the same." Other witnesses said the same.

For his part, while David asked for joint physical care in his answer to the dissolution petition, he was leaning toward his alternative request of placing the children in his physical care by trial:

> I thought we could have done shared care; but like when you sort of have everything in your face and see how often someone's trying to diminish and undermine you . . . then I do have concerns about it because I've been frequently the facilitator of like easing the tension in the house and chilling everybody out, and I'm often the one that has to bite my lip and just talk to Nicole where she can just

go off on me. And it's concerning to me because I'm not sure what that would look like if she was primary parent.

David was also concerned that if the children were placed with Nicole, "she would just slowly chisel away" at his relationship with them.

The district court didn't fully share David's concerns in its decree dissolving the parties' marriage. While the court found his evidence that Nicole was "not supportive of his relationship with the children" to be problematic, the court "believe[d] each parent has [their] own ways of getting their jabs in at the other and that the children are witnessing the same." The court hoped that "this is more of a product of these parents continuing to reside within the same house during this dissolution proceeding," which would subside following dissolution of the marriage. Overall, the court found that, "[d]espite the instances of negative conduct provided, . . . both parents are supportive of the other parent's relationship with their children." Yet, given Nicole's status as the primary caregiver over the years, the court concluded joint physical care was not in the children's best interests and placed them in Nicole's physical care. David appeals, claiming the children should have instead been placed in his physical care.

## II.      Standard of Review

We review dissolution proceedings de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007).

### III.    Analysis

Because David does not contest the district court's decision to deny joint physical care, the only issue before us is which parent should serve as the children's primary caretaker.  *See In re Marriage of Hansen*, 733 N.W.2d 683, 691 (Iowa 2007) ("If joint physical care is not warranted, the court must choose a primary caretaker who is solely responsible for decisions concerning the child's routine care.").  Our focus in resolving this issue is the best interests of the children. *See Fennelly*, 737 N.W.2d at 101.  "The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity."  *Hansen*, 733 N.W.2d at 695. Generally, courts consider the nonexclusive factors contained in Iowa Code section 598.41(3) (2022) and *In re Marriage of Winter*, 233 N.W.2d 165, 166–67 (Iowa 1974), when making physical care decisions.[1]  Those factors include the suitability of parents, whether the children will suffer from lack of contact with and attention from both parents, quality of parental communication, the previous pattern of caregiving, and each parent's support of the other.  *See* Iowa Code § 598.41(3)(a)–(e).

With those factors in mind, David argues that he is the more suitable parent because Nicole's "attitude toward her daughters . . . is quite negative," she generally dismisses the children's feelings and mental health, she places the

---

[1] "The factors the court considers in awarding custody are enumerated in Iowa Code section 598.41(3)."  *In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996).  "Although Iowa Code section 598.41(3) does not directly apply to *physical care* decisions, . . . the factors listed here as well as other facts and circumstances are relevant in determining" physical care.  *Hansen*, 733 N.W.2d at 696.

children in the middle of parenting issues, and she does not support the children's relationship with David. Nicole, on the other hand, simply asserts that the court's decision should be affirmed because she was "the primary caretaker for the children throughout the years."

But the question is more involved than that under our multi-factor analysis where "no one criterion is determinative." *Hansen*, 733 N.W.2d at 697. We have long recognized "[t]he fact a parent was the primary caretaker prior to separation does not assure he or she will be the custodial parent." *In re Marriage of Decker*, 666 N.W.2d 175, 178 (Iowa Ct. App. 2003); *accord Howard v. Johnson*, No. 04-1855, 2005 WL 1398333, at *1 (Iowa Ct. App. June 15, 2005) ("[W]e do not award custody based on hours of service for past care."). We think this is especially true with a father like David who, although he was the family's primary breadwinner, was not uninvolved like Nicole would have us believe. *See In re Marriage of Kunkel*, 546 N.W.2d 634, 635 (Iowa Ct. App. 1996) (affirming physical care with a father who "had a substantial influence" in the children's upbringing even though the mother was the primary caretaker while he worked).

The district court recognized this to a certain extent, finding that while it had "no doubt that Nicole has been the primary caregiver for the children throughout the years," the court was "not saying that David hasn't parented the children." Instead, the court concluded that his "role in caring for the children did not ever consistently rise to the level of Nicole caring for the children." But David correctly challenges the quality of that caretaking and its effect on the children's mental and emotional health, which was already suffering. *See Hansen*, 733 N.W.2d at 697 ("[T]he quality of the parent-child relationship is not always determined by hours

spent together. . . ."); *Robertson v. Cannon*, No. 03-1978, 2004 WL 2002499, at *3 (Iowa Ct. App. Sept. 9, 2004) ("While the child's physical and financial stability are important considerations, great emphasis is placed on achieving emotional stability for the child.").

While the court also recognized Nicole's negative attitude toward the children and lack of support for David's relationship with them, we agree with David that those factors should have been given more weight. Iowa courts "do not tolerate hostility exhibited by one parent to the other." *Decker*, 666 N.W.2d at 180. And Nicole has been hostile to the extreme—not just in private with David, but in text messages with the children and in public with friends and family. Even though the court found that David likewise gets "jabs" in at Nicole, there was no evidence in the record to support that finding. "The ability of each parent to actively support the other parent's relationship with the child is an important factor in determining the physical [care] arrangement." *In re Marriage of Manson*, 503 N.W.2d 427, 429 (Iowa Ct. App. 1993); *accord* Iowa Code § 598.41(3)(e). "More importantly, the ability of each parent to do so is instrumental in the successful mental, emotional, and social development of the children." *Manson*, 503 N.W.2d at 429. Nicole has shown no ability to support David's relationship with the children, undermining and demeaning him at every opportunity. In contrast, David worked to gloss over Nicole's shortcomings when the children complained to him and continually assured them of her love.

So, while Nicole has done more historically in terms of transportation, sporting events, clothing purchases, medical appointments, and parent-teacher conferences, that does not mean she will provide them with the "environment most

likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695; *see, e.g.*, *In re Marriage of Gemmell*, No. 15-1429, 2016 WL 1697081, at *6 (Iowa Ct. App. Apr. 27, 2016) (affirming award of physical care to non-primary parent where mother "has proved unwilling to support [dad's] role as a father"); *In re Marriage of Morris*, No. 09-1520, 2010 WL 2757093, at *5 (Iowa Ct. App. July 14, 2010) (affirming award of physical care to non-primary parent where that parent was "more willing and able to assist [the child] in developing a strong relationship with both parents"); *In re Marriage of Eiden*, No. 08-0835, 2008 WL 5235335, at *2 (Iowa Ct. App. Dec. 17, 2008) (affirming award of physical care to mother—who was not primary caregiver—where father's conduct was "more detrimental to the children than" was the mother's); *Robertson*, 2004 WL 2002499, at *3–5 (modifying custody decree to place child in father's physical care, even though he was absent for the child's early years, because he was better able to "raise a physically, mentally, and socially healthy child"); *In re Marriage of Seavey*, No. 00-674, 2000 WL 1826046, at *2 (Iowa Ct. App. Dec. 13, 2000) (granting mother's request to modify a dissolution decree to place the children in her physical care where the father degraded her in front of the children and undermined her relationship with them).

After balancing all the relevant statutory factors, and considering the totality of the evidence, we find that it is in the children's best interests to be placed in David's physical care and modify the decree accordingly. The case is remanded to the district court to determine Nicole's visitation and recalculate child support based on the parties' present circumstances. *See, e.g.*, *Gates v. Johnson*, No. 20-0932, 2021 WL 3661413, at *5 (Iowa Ct. App. Aug. 18, 2021); *In re*

*Marriage of Cerwick*, No. 12-1188, 2013 WL 2370722, at *5 (Iowa Ct. App. May 30, 2013). Both parties' requests for appellate attorney fees are denied. *See In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007) (considering the needs of the party making the request, the ability of the other party to pay," the relative merits of the appeal, and whether the party making the request had to defend the district court's decision on appeal).

**AFFIRMED AS MODIFIED AND REMANDED WITH DIRECTIONS.**